**No. 2024-2321**

# United States Court of Appeals for the Federal Circuit

PICTOMETRY INTERNATIONAL CORPORATION,

*Appellant*,

*v.*

ROOFR INC.,

*Appellee*.

On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2023-00436

## PICTOMETRY'S OPENING BRIEF

Richard A. Crudo
Michael D. Specht
William H. Milliken
Jonathan Tuminaro
Richard M. Bemben
Steven M. Pappas
Jennifer Meyer Chagnon
STERNE KESSLER GOLDSTEIN & FOX PLLC
1101 K Street, NW
Floor 10
Washington, DC 20005
(202) 371-2600

*Counsel for Appellant Pictometry International Corporation*

February 10, 2025

## PATENT CLAIMS AT ISSUE

Claims 1, 11, and 18 of U.S. Patent No. 9,183,538 are representative for purposes of this appeal.

1. One or more non-transitory computer readable medium storing a set of computer executable instructions for running on one or more computer systems that when executed cause the one or more computer systems to:

   identify a geographic location of a roof;

   determine a footprint and predominant pitch of the roof by analyzing one or more image showing the roof;

   determine an estimated roofing area of the roof based on the predominant pitch and the footprint of the roof; and

   generate a roof report for determination of an amount of materials needed for a construction project, wherein the roof report includes at least one image showing the roof and the estimated roofing area of the roof.

11. The one or more non-transitory computer readable medium of claim 10, wherein each pitch value is associated with an estimated percentage of roof area to provide an average pitch value.

18. The roofing estimate method of claim 14, wherein the predominant pitch is based on a weighted average of individual pitch factors for two or more portions of the roof.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-2321

**Short Case Caption** Pictometry International Corporation v. Roofr Inc.

**Filing Party/Entity** Pictometry International Corporation

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/10/2025

Signature: /s/ Richard A. Crudo

Name: Richard A. Crudo

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Pictometry International Corporation | | EagleView Technology Corporation |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Marc Brockhaus<br>Dunlap Codding, P.C. | Ann Robl<br>Dunlap Codding P.C. | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS


STATEMENT OF RELATED CASES ................................................................ vi

JURISDICTIONAL STATEMENT ......................................................................1

INTRODUCTION ..........................................................................................1

STATEMENT OF THE ISSUES .......................................................................4

STATEMENT OF THE CASE ..........................................................................5

I. TECHNOLOGY BACKGROUND ..................................................................5

A. The ’538 Patent ..................................................................................5

1. The Prior-Art Method for Calculating a Roof’s Area Using the Roof’s Pitch: Accuracy Over Efficiency ....................................7

2. The ’538 Patent’s Method Using a “Predominant Pitch” from Aerial Images: Achieving Both Accuracy and Efficiency .......10

3. The Claims ...................................................................................12

B. The Prior Art: Bailey’s Attempt to Increase Efficiency by Using a Roof’s Most-Common Pitch ..........................................................13

II. THE IPR PROCEEDING .........................................................................18

A. The Board Determines that Bailey’s “Predominant Slope” Is Equivalent to the ’538 Patent’s “Predominant Pitch” Based Solely on the Similarity in Language, and thus Invalidates Claims 1-10 and 12-17. .........................................................................................18

B. The Board Determines that Weighted Averages Were Known, and thus Invalidates Dependent Claims 11 and 18. ..................................22

SUMMARY OF THE ARGUMENT ..............................................................25

STANDARDS OF REVIEW .........................................................................26

ARGUMENT ..............................................................................................28

I. THE BOARD ERRED IN HOLDING THE ’538 PATENT CLAIMS OBVIOUS. ..........28

A. The Board’s Obviousness Conclusion Rests on Legal Error. .............28

1. The Board Failed to Make a Finding that Bailey Discloses the “Predominant Pitch” Limitation. ............................................28

2. The Board Failed to Apply the Parties’ Agreed-Upon Interpretation of “Predominant Pitch.” ....................................31

3. The Board Improperly Shifted the Burden to Pictometry to Prove the Claims Nonobvious. ....36

B. Under the Correct Legal Framework, Substantial Evidence Does Not Support the Board's Finding that Bailey Discloses the "Predominant Pitch" Limitation. ....37

1. Bailey's Passing Reference to Measuring a "Predominant Slope" Does Not Satisfy "Determin[ing] a … Predominant Pitch." ....38

2. The Board's Reasons for Rejecting Pictometry's Arguments Misapprehend Both Roofr's Obviousness Combination and the Law. ....43

II. THE BOARD INDEPENDENTLY ERRED IN HOLDING DEPENDENT CLAIMS 11 AND 18 OBVIOUS. ....47

A. Bailey Indisputably Does Not Disclose Using a Weighted Average to Determine Predominant Pitch, and the Board Erred by Relying on the RSMeans Construction Dictionary to Fill the Gap. ....48

B. The Board Failed to Address Pictometry's Arguments as to Claim 18. ....52

CONCLUSION ....54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adidas AG v. Nike, Inc.*,
963 F.3d 1355 (Fed. Cir. 2020) ....................51

*Alacritech, Inc. v. Intel Corp.*,
966 F.3d 1367 (Fed. Cir. 2020) ....................29, 30

*Allentown Mack Sales & Service, Inc. v. NLRB*,
522 U.S. 359 (1998)....................29

*Aqua Products, Inc. v. Matal*,
872 F.3d 1290 (Fed. Cir. 2017) ....................36

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) ....................27, 51

*Bates v. Coe*,
98 U.S. 31 (1878)....................3, 34

*Cross-Sound Ferry Services, Inc. v. I.C.C.*,
738 F.2d 481 (D.C. Cir. 1984)....................30

*Dell Inc. v. Acceleron, LLC*,
818 F.3d 1293 (Fed. Cir. 2016) ....................26

*Dow Chemical Co. v. Astro-Valcour, Inc.*,
267 F.3d 1334 (Fed. Cir. 2001) ....................32

*EmeraChem Holdings, LLC v. Volkswagen Group of America, Inc.*,
859 F.3d 1341 (Fed. Cir. 2017) ....................27

*Fanduel, Inc. v. Interactive Games LLC*,
966 F.3d 1334 (Fed. Cir. 2020) ....................27

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ....................27

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)....................50

*Hill-Rom Services, Inc. v. Matal*,
716 F. App'x 996 (Fed. Cir. 2017) ....................29, 30

*Homeland Housewares, LLC v. Whirlpool Corp.*,
865 F.3d 1372 (Fed. Cir. 2017) ....................35

*Impax Laboratories Inc. v. Lannett Holdings Inc.*,
893 F.3d 1372 (Fed. Cir. 2018) ....................46

*International Business Machines Corp. v. Iancu*,
759 F. App'x 1002 (Fed. Cir. 2019) ....................40

*InTouch Technologies, Inc. v. VGO Communications, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ....................34, 35, 38

*King v. St. Vincent's Hospital*,
502 U.S. 215 (1991)....................33

*In re Magnum Oil Tools International, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ....................36, 37

*Novartis Pharmaceuticals Corp. v. Accord Healthcare, Inc.*, 38 F.4th
1013 (Fed. Cir. 2022)....................40

*In re NuVasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ....................29, 30

*Plastic Omnium Advanced Innovation & Research v. Donghee America, Inc.*,
943 F.3d 929 (Fed. Cir. 2019) ....................35

*Polaris Industries, Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ....................46

*Praxair, Inc. v. ATMI, Inc.*,
543 F.3d 1306 (Fed. Cir. 2008) ....................36

*Provisur Technologies, Inc. v. Weber*,
50 F.4th 117 (Fed. Cir. 2022) ....................53

*Qualtrics, LLC v. OpinionLab, Inc.*,
679 F. App'x 1016 (Fed. Cir. 2017) ....................50

*Realtime Data, LLC v. Iancu*,
912 F.3d 1368 (Fed. Cir. 2019) ....................................................................32

*In re Sang-Su Lee*,
277 F.3d 1338 (Fed. Cir. 2002) ....................................................................29

*TI Group Automotive Systems (North America), Inc. v. VDO North America, L.L.C.*,
375 F.3d 1126 (Fed. Cir. 2004) ....................................................................33

*Toro Co. v. Deere & Co.*,
355 F.3d 1313 (Fed. Cir. 2004) ....................................................................33

*TQ Delta, LLC v. Cisco Systems, Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ....................................................................44

*In re Universal Electronic, Inc.*,
2023 WL 3335536 (Fed. Cir. 2023) ...............................................................53

*Virtek Vision International ULC v. Assembly Guidance Systems, Inc.*,
97 F.4th 882 (Fed. Cir. 2024) ..................................................47, 51, 54

**Statutes**

5 U.S.C. § 557(c)(3)(A) ..........................................................................29

5 U.S.C. § 706(2) ......................................................................................27

28 U.S.C. § 1295(a)(4)(A) ..........................................................................1

35 U.S.C. §§ 141(c), 319 ............................................................................1

35 U.S.C. § 316(e) .....................................................................................36

**Other Authorities**

37 C.F.R. § 90.3(a)(1) ..................................................................................1

## STATEMENT OF RELATED CASES

There is no other appeal in or from the same proceeding that was previously before this or any other appellate court. The patent at issue here (U.S. Patent No. 9,183,538) is also at issue in *Pictometry International Corp v. Roofr, Inc.*, No. 1:21-cv-01852 (D. Del.), which is currently pending. The Court's decision in this appeal will directly affect that case.

This case is designated as a companion to *Pictometry International Corp. v. Roofr Inc.*, No. 24-2322 (Fed. Cir.), which is an appeal from an IPR of U.S. Patent No. 10,648,800. The '800 patent is unrelated to the '538 patent, but the patents are directed to the same general area of technology, and the two proceedings involve some of the same prior art.

## JURISDICTIONAL STATEMENT

The Board issued its final written decision on July 11, 2024, Appx1-17, and Pictometry timely noticed its appeal on September 11, 2024, Appx568-572; 35 U.S.C. §§ 141(c), 319; 37 C.F.R. § 90.3(a)(1). This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## INTRODUCTION

It has been said that brevity is the soul of wit. But the Board's final written decision here takes that adage too far. In fewer than seven pages of analysis, the Board invalidated all eighteen claims of Pictometry's '538 patent as obvious. It did so, moreover, without directly citing the prior art or either side's expert testimony. That analysis (or lack thereof) is woefully deficient under the APA and led to a series of substantive errors that placed a thumb on the scale in favor of obviousness. Under the correct legal framework, substantial evidence does not support the Board's ruling.

Pictometry is a technology company renowned for its aerial-imagery, geospatial, and AI-driven analytics capabilities for government, commercial, and residential applications. Pictometry's '538 patent claims an automated, computer-based system and method for estimating roof measurements based on aerial images. Critically, the claims require determining a roof's area using a parameter called "predominant pitch." The parties agreed that the '538 patent's "predominant

pitch" has a particular meaning: a single pitch value representing the steepness of a roof that accounts, in some fashion, for the pitch of every roof section—i.e., something analogous to a weighted average of each section's pitch.

The Board never bothered to make an express finding that the prior art (an Army Corp of Engineers report having nothing to do with roof area calculation, called "Bailey") satisfies the "predominant pitch" limitation. Nor did the Board apply the parties' agreed-upon interpretation of that limitation. Instead, the Board simply assumed that Bailey's reference to a "predominant slope" satisfies the limitation because it includes the word "predominant." The Board then required *Pictometry* to prove otherwise.

That analysis, of course, impermissibly shifts the burden of proof, which alone requires at least vacatur. Even beyond that, the Board legally erred by equating—with no analysis—the '538 patent's "predominant pitch" and Bailey's "predominant slope" based on a words-to-words comparison and nothing more. Where, as here, a claim term has a unique meaning that departs from its plain-English meaning, a proper invalidity analysis must ask whether a skilled artisan would have understood the prior-art reference's disclosure, as used in the context of the reference as a whole, to convey the same *meaning* as the claim term. Or, as the Supreme Court aptly put it nearly 150 years ago: "[i]n determining about similarities and differences," courts must not merely look to "the names of things"

but instead must "look at the machines and their devices in the light of what they do[] … and find that a thing is substantially the same as another[.]" *Bates v. Coe*, 98 U.S. 31, 42 (1878).

The Board never performed such an analysis nor considered important context provided by Bailey itself. Had it done so, it would have concluded that Bailey's "predominant slope" is simply the roof's *most-common pitch* associated with the majority of a roof's area and thus does not account for the pitch of each roof section, as required by the parties' shared interpretation of "predominant pitch." In fact, Bailey's use of a most-common pitch is consistent with Bailey's goal of efficiently collecting roof data as quickly as possible *without* having to measure each and every section pitch (as would be required to determine the "predominant pitch" under the parties' shared interpretation of that term). And using Bailey's most-common pitch rather than a predominant pitch leads to a different area calculation altogether. In other words, despite similarity in their language, Bailey and the '538 patent are apples to oranges.

The Board separately erred with respect to dependent claims 11 and 18. Those claims require the predominant pitch to comprise a weighted average of pitch values. But rather than explain why a skilled artisan would have calculated Bailey's predominant slope using a weighted average, the Board placed dispositive weight on a dictionary definition of the phrase "weighted average" for the

proposition that weighted averages were generally known and more representative of a data set than straight averages.

Setting aside that the dictionary was not included in Roofr's obviousness grounds, the dictionary is not probative of obviousness at all. At most, the dictionary establishes that it would have been obvious to use weighted averages instead of straight averages. But Bailey does not disclose straight averages in the first place, nor did the Board find otherwise. Still further, the Board did not address—not even cursorily—Pictometry's separate arguments addressing claim 18. Rather, the Board assumed (incorrectly) that claims 11 and 18 fell together.

All this is to say that the Board's decision is not just terse—it is legally erroneous and unsupported by substantial evidence. The Court should reverse.

## STATEMENT OF THE ISSUES

I. With respect to all claims of the '538 patent, whether the Board erred by invalidating the claims as obvious where:

A. as a procedural matter, the Board (1) failed to make a finding that Bailey's "predominant slope" satisfies the claimed "predominant pitch"; (2) failed to apply the parties' agreed-upon interpretation of "predominant pitch" requiring it to account for each roof section's pitch, and instead equated Bailey's "predominant slope" with the claimed "predominant pitch" simply because they use similar

language; and (3) inverted the burden of proof by requiring Pictometry to prove that Bailey's "predominant slope" is not the claimed "predominant pitch";

B. as a substantive matter, Bailey's "predominant slope" is simply the most-common pitch accounting for the majority of the roof's area and thus does not satisfy the parties' agreed-upon interpretation of the claim phrase.

II. With respect to dependent claims 11 and 18, which require the predominant pitch to comprise a weighted average of pitches, whether the Board erred in invalidating the claims as obvious (A) based solely on a dictionary that, at most, describes an advantage of using weighted averages over straight averages and thus does not fill the gap between Bailey (which does not disclose even a straight average) and the claim requirements; and (B) without addressing Pictometry's separate arguments with respect to claim 18.

## STATEMENT OF THE CASE

### I. TECHNOLOGY BACKGROUND

#### A. The '538 Patent

The '538 patent is directed to a computerized system and method for measuring roofs using aerial imagery. Appx18(Abstract); Appx31(1:10-25); Appx32(3:21-23, 3:65-4:8); Appx33(5:10-13). Among other things, the invention can be used to accurately calculate a roof's area and automatically generate a report for determining the cost of repair or replacement, as shown below:




**FIG. 8 (Continued)**

Appx29-30(Fig. 8) (excerpted); Appx36-37(12:37-13:27); Appx37(14:58-62).

Before the ’538 patent, roofing estimates were performed by contractors who had to physically visit a homeowner’s property, take measurements while standing on the roof, and manually prepare a written report. Appx31(1:13-16). As any homeowner who has obtained a quote for a new roof knows, this manual approach is a painstaking process. It is “laborious” and costly, and the timeliness and accuracy of the quote is impacted by various factors beyond the homeowner’s control, including the contractor’s availability, the size and steepness of the roof, weather conditions, and the like. Appx31(1:17-25); Appx4965-4966(¶26). Not to mention that the process can be hazardous for the contractors, who must get on the roof to take the required measurements. Appx31(1:21-23).

The ’538 patent eliminates these problems by using aerial images to prepare a report without the need for a contractor to visit the home. Appx31(1:30-33). Relevant to this appeal is the patent’s determination of a “predominant pitch” for calculating a roof’s area. To understand why the patent’s predominant pitch is inventive, one first needs to understand the general concept of roof pitch and how it was used in the prior art.

### 1. The Prior-Art Method for Calculating a Roof’s Area Using the Roof’s Pitch: Accuracy Over Efficiency

Roofs come in a variety of shapes and styles. One of the simplest types of roofs is a “gabled” roof, which comprises two rectangular planes whose upper edges meet to form a ridge:




Appx1794(Fig. 13) (excerpted and numerals omitted). To determine the area of such a roof, one can simply multiply each plane’s length by its width. Appx1795-1796. But that approach requires a contractor to measure the roof dimensions in the

first place, which may be difficult (and dangerous) to do, especially for steeply inclined roofs. *Id.*

Alternatively, one may indirectly measure a roof's area using the roof's "footprint" and "pitch." Appx36(12:36-12:39); Appx27(Fig. 6). A footprint is the area of the roof's horizontal projection. Appx36(11:55-12:9); Appx5332. A "pitch" (also called "slope")[1] is the roof's degree of inclination and is typically expressed as either a ratio (i.e., the ratio of the roof's rise (C in Figure 7 below) to its run (A)) or as a "pitch factor" (i.e., the roof's hypotenuse (B) divided by the run). A table of exemplary pitches and pitch factors is shown in Figure 7 below:

**Slope Factor Chart**

| Pitch of Roof | 1:12 | 2:12 | 3:12 | 4:12 | 5:12 | 6:12 | 7:12 | 8:12 | 9:12 | 10:12 | 11:12 | 12:12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Slope Factor | 1.0035 | 1.0138 | 1.0308 | 1.0541 | 1.0833 | 1.1180 | 1.1577 | 1.2019 | 1.2500 | 1.3017 | 1.3566 | 1.4142 |

(A) x (Slope Factor) = (B)




**FIG. 7**

Appx28(Fig. 7) (annotated to add "C"); Appx5516; Appx5616; Appx5904;

---

[1] The art sometimes draws a technical distinction between pitch and slope, *see, e.g.*, Appx1795, but that distinction is irrelevant here.

Appx5905; Appx5912; Appx5914. For a gabled roof having a single pitch, one can calculate the roof's area by multiplying the roof's footprint by the pitch factor. Appx4957(¶7); Appx1940-1941(7:21-9:4).

But this indirect method for calculating area can become unwieldy for roof structures having many sections with different pitches:




Appx1797(Fig. 17). One approach in the prior art for dealing with such roofs was to calculate the area of each section individually using the section's footprint and pitch, as described above, and then add the constituent areas together (deducting any overlapping areas). *See, e.g.*, Appx1797-1798. But, while that approach is accurate insofar as it yields the correct total area, it is inefficient since it requires a contractor to get on the roof, measure each section's pitch, and calculate each section's area.

Another approach was to simply use the most-common pitch—i.e., the pitch

corresponding to the majority of the roof's area—as a proxy for each individual roof section pitch. But, while that approach "increases the speed of estimation and requires fewer field measurements," Appx4988-4989(¶68), it is inaccurate since it effectively ignores differences in inclination between roof sections.

The problem in the art was to find a way to accurately estimate a roof's area while increasing efficiency—e.g., by "increas[ing] speed" and "reduc[ing] costs." Appx31(1:31-34); Appx4966(¶27); Appx4988-4989(¶68). Stated differently, the goal was to avoid having to make a choice between accuracy and efficiency.

#### 2. The '538 Patent's Method Using a "Predominant Pitch" from Aerial Images: Achieving Both Accuracy and Efficiency

As explained above, the '538 patent achieves that goal by using a computer-based system that accurately calculates a roof's area based on aerial-image analysis, without the need for contractors to make on-site measurements. Given the patent's automated implementation, moreover, the claimed method does not need to take any shortcuts en route to its area determination—e.g., by using the most-common pitch of the roof as a proxy for each section's pitch.

Relevant here, the '538 patent determines roof areas using what it calls a "predominant pitch." The predominant pitch is a single value which accounts, in some fashion, for the pitch of every roof section. Appx511(31:13-15); Appx90; Appx1540(¶94); Appx4970-4971(¶33). For example, the '538 patent describes an

embodiment in which the predominant pitch is a "weighted average of individual pitch factors for two or more portions of the roof." Appx36(12:11-13). In that example, the predominant pitch is calculated by multiplying the pitch factor of a roof section by the percentage of the roof having that pitch, and summing the resulting values for each section.[2] Appx36(12:14-37). Then, to calculate the total area of the roof, the predominant pitch factor is simply multiplied by the roof's total footprint as described above. Appx36(12:37-39). Thus, each roof section's pitch is reflected in the calculated area, weighted by the prevalence of the pitch across the entire roof. Pitches corresponding to the majority of the roof's area receive greater weight, while pitches corresponding to just a single section receive less weight. But all pitches receive at least some weight.

To be clear, the phrase "predominant pitch" is not a term of art, nor is it defined in any of the well-known construction dictionaries or manuals. Appx5530; Appx5913; Appx5928; Appx5937; Appx5974; Appx5988; Appx4983-4988(¶¶59-66); Appx406. And, in a sense, the phrase is a misnomer because, while the plain-English meaning of "predominant pitch" suggests the "most-frequent or common"

---

[2] The '538 patent provides a simple example: if 60% of the roof has a 6:12 pitch (corresponding to a 1.1180 pitch factor, as shown in Figure 7), and 40% of the roof has a 4:12 pitch (corresponding to a 1.0541 pitch factor), the weighted average would be: (1.1180 *x* 0.60) + (1.0541 *x* 0.40) = 1.09244. That is the predominant pitch factor, which, in turn, corresponds to a 5:12 predominant pitch. Appx36(12:14-37).

pitch representing the majority of the roof's area, Appx4946; Appx5997; Appx5048(53:2-11), that is not how the '538 patent uses the phrase, Appx1941(9:9-10:6). Rather, as explained above, the '538 patent's predominant pitch is a single value that accounts for all roof sections.

The prior art did not use anything akin to the '538 patent's predominant pitch to calculate roof areas. As the Examiner noted during prosecution, the art "fails to teach 'predominant pitch'" at all. Appx4530; *see also* Appx1338; Appx4658.

### 3. The Claims

The '538 patent includes eighteen claims, three of which (claims 1, 13, and 14) are independent. Claim 1 is representative of the patent's independent claims and is reproduced below with limitations separated for easier readability, and with the "predominant pitch" limitation at issue here emphasized:

> 1. One or more non-transitory computer readable medium storing a set of computer executable instructions for running on one or more computer systems that when executed cause the one or more computer systems to:
>
> identify a geographic location of a roof;
>
> determine a footprint and *predominant pitch of the roof by analyzing one or more image* showing the roof;
>
> determine an estimated roofing area of the roof based on the predominant pitch and the footprint of the roof; and
>
> generate a roof report for determination of an amount of materials

> needed for a construction project, wherein the roof report includes at least one image showing the roof and the estimated roofing area of the roof.

Appx38(15:21-32) (emphasis added). As shown, claim 1 requires that the system determine predominant pitch "of the roof" as a whole, thus further supporting the notion that the predominant pitch must account for each and every roof section.

Dependent claims 11 and 18 further specify that the predominant pitch comprises a weighted average. In particular, claim 11 requires (through its dependency from claim 10) that the predominant pitch be "based on [a] plurality of pitch values" associated with sections of the roof, and that each pitch value be "associated with an estimated percentage of roof area to provide an average pitch value." Appx38(16:15-23). Claim 18 is similar to claim 11 except that it requires the predominant pitch to be based on a weighted average of individual "pitch factors"—not pitch values, as in claim 11—for two or more roof sections. Appx39(17:16-18). As explained above, a pitch factor is the roof's hypotenuse divided by the roof's run, whereas a pitch value is the roof's rise divided by the run. *See supra* p.8. The two parameters, though related, are different.

### B. The Prior Art: Bailey's Attempt to Increase Efficiency by Using a Roof's Most-Common Pitch

For most claim limitations, Roofr relied on two primary references—Pershing-789 (Appx1581-1594) and Kennedy (Appx1628-1662)—both of which were considered during prosecution of the '538 patent. *See* Appx4538 (IDS listing

Kennedy); Appx4661 (IDS listing Pershing-787, which is substantively identical to Pershing-789). Those references generally describe systems and methods for determining a roof's area using aerial images, but neither discloses the "predominant pitch" or "weighted average" limitations at issue here.

For those limitations, Roofr turned to a third reference, Bailey (Appx1663 et seq.). Bailey is a 1999 U.S. Army Corp. of Engineers report that describes procedures designed "to help facility managers more efficiently manage their roofing assets" such as Army barracks and the like in order to "make the best use of roof maintenance and repair dollars." Appx1663-1670. Bailey's focus is not on accurately calculating roof area, but on efficient data collection—i.e., enabling engineers to manually collect large volumes of roof data (from among the "200 million square feet of asphalt shingle roofing" maintained by the Army) as efficiently as possible and in a standardized way. Appx1668; Appx5051(56:4-11).

Chapter 2 of the report (Appx1671-1683) explains how that goal is achieved. It provides a sample worksheet that "simplifies the task of collecting the inventory data for a roof section[[3]] and ensures uniformity in reporting terminology":

---

[3] In Bailey, a single roof section is any portion of the roof having an area of 10,000 square feet or less. Appx1671.



ROOF SECTION IDENTIFICATION WORKSHEET | AGENCY/INST.: Example

DATE: JUN/ 1999 | BLDG. NO.: 1253 | SECTION ID: A | AREA: 2813 SF

OCCUPANCY: | YEAR ORIG. CONST.: ____ | YEAR LAST REPLACED: ____

10 GENERAL

11 TYPE (check all):

X GABLE
X HIP
__ GAMBREL
__ SHED
__ DOME
__ BARREL
__ OTHER

12 PERIMETER (check all):

PARAPET ____ LF
ROOF EDGE 234 LF
ADJACENT WALL ____ LF
FIREWALL ____ LF
HIP 116 LF
VALLEY 70 LF
RIDGE 69 LF
OTHER ____ LF

....



32 ATTACHMENT SURFACE (if applicable):

__ WOOD FIBER
__ PLYWOOD
__ WOOD BOARDS
__ WOOD BATTENS
__ METAL PURLINS
__ OTHER
__ UNKNOWN

33 SLOPE (primary): 4 IN 12

34 DRAINAGE (check all):

__ INTERIOR DRAINS
__ INTERIOR GUTTERS
X GUTTERS & DOWNSPOUTS
__ SCUPPERS
__ ADJACENT ROOF SECTIONS
__ SCUPPERS W/LEADER & DOWNSPOUTS
__ OVERFLOW SCUPPERS
__ ROOF EDGE
__ OTHER

Appx1673; Appx1675-1677(Fig. 4) (annotated and excerpted). As shown in box 33 of the worksheet, one example of collected data is "slope (primary)." Bailey describes this slope in just two sentences of its nearly 150-page report:

> *Section 33 – Slope*. The predominant slope of the roof section. The roof plan will generally indicate the slope (e.g., 4 in. in 12). If the slope is not noted on the roof plan, the section drawings may indicate the slope. If such information is not available, field measurement will be required (use the method in Appendix B).

Appx1678. The first sentence above refers to a "predominant slope" but does not

suggest that such a slope is used to determine a roof's area (and, in fact, roof area is itself listed in the top row of the worksheet as a separate piece of collected data). Nor does the above description explain how to determine the predominant slope or suggest that it is anything akin to a weighted average of individual pitch values. Appx5049-5050(54:17-55:4).

The worksheet's use of the word "primary" suggests that Bailey's predominant slope, unlike the '538 patent's predominant pitch, is the most "prominent" or "main" pitch representing the majority of the roof's area. Appx5048(53:2-11); Appx4988-4989(¶¶67-68). That interpretation is consistent with the plain-English meaning of the word "predominant," *see supra* p.11, and comports with Bailey's goal of manually collecting a large amount of data quickly, Appx5051(56:4-11). By using the most-common pitch as a proxy for each roof section's pitch, Bailey eliminates the need to measure each pitch and thus improves efficiency in the data-collection process. Appx4988-4989(¶68).

The second sentence in Bailey's description above likewise does not explain how predominant slope is determined except to say that "the slope"—not necessarily the "predominant slope"—can be "noted on the roof plan," indicated in drawings, or determined via a "field measurement" using a method described in Appendix B of the report. Appx1678; *see also* Appx1682; Appx5054-5055(59:8-60:4).

Appendix B (Appx1794-1798), in turn, is an excerpt from a 1997 Residential Asphalt Roofing Manual published by the Asphalt Roofing Manufacturers Association, an excerpt of which was considered during prosecution of the ’538 patent. Appx4552. The guide does not refer to predominant slope at all. Appx5058-5059(63:19-64:14). And, rather than explain how a roof’s area can be calculated using a single pitch, the guide simply describes the prior-art method for determining a roof’s area based on the pitch “for each exposure.” Appx1682. That is, an engineer first determines the pitch and corresponding pitch factor[4] for each roof section, multiplies the factor by the section’s footprint, and sums over each section’s area. *See* Appx1795; Appx1798. In other words, unlike the embodiment described in the ’538 patent specification—in which pitch values are weighted and combined to determine the total area—the pitch values described in Bailey’s Appendix B “are not combined until the true roof areas have been determined.” Appx1796.

Putting all this together, to the extent Bailey’s predominant slope corresponds to a “primary” pitch of a roof section as described in Chapter 2, it is simply the most-common pitch of the roof (which promotes efficiency at the expense of accuracy). Appx4988-4989(¶¶67-68). And, to the extent Bailey’s

---

[4] Bailey refers to the pitch factor as an “area/rake factor.” Appx1798.

predominant slope is determined via the method described in Appendix B, it is simply the pitch of an individual roof section (which promotes accuracy at the expense of efficiency). Appx4969-4971(¶¶32-33); Appx5058-5059(63:19-64:14). Neither is a predominant pitch as claimed in the ’538 patent and both lead to an area calculation that is different than one using the claimed predominant pitch. Appx4972-4974(¶¶37-39); Appx1942(16:8-18).

## II. THE IPR PROCEEDING

Roofr challenged all claims of the ’538 patent in an IPR as obvious over various prior-art references, including Pershing-789 (Grounds 1-2) and Kennedy (Grounds 3-4) as the primary references, and Bailey as the secondary reference. In a final written decision comprising fewer than seven pages of analysis, the Board invalidated all eighteen claims. Appx7-14.

### A. The Board Determines that Bailey’s “Predominant Slope” Is Equivalent to the ’538 Patent’s “Predominant Pitch” Based Solely on the Similarity in Language, and thus Invalidates Claims 1-10 and 12-17.

**1.** Roofr’s petition argued that the “predominant pitch” limitation requires “a weighted average of roof pitch values,” notwithstanding that dependent claims 11 and 18 expressly recite weighted averages. Appx69; Appx89-90. And, relying heavily on Bailey’s Chapter 2 and Appendix B, Roofr argued that “Bailey’s disclosure of ‘predominant slope’ is an express disclosure of ‘predominant pitch,’” notwithstanding that Bailey says nothing about weighted averages. Appx99; *see*

*generally* Appx88-104; Appx121-122; Appx127; Appx129-140. In so arguing, Roofr made clear that it was relying on Bailey—and only Bailey—for "calculating the 'predominant slope' of the roof," and that a skilled artisan would have incorporated Bailey's alleged weighted-average calculation into each of Pershing-789 and Kennedy. Appx99; *see also* Appx89-91; Appx116; Appx134.

Pictometry argued in response that the petition was deficient on its face because it failed to show that Bailey discloses the "predominant pitch" limitation under Roofr's "own interpretation" requiring a weighted average. Appx211; *see generally* Appx209-215. Instead, the petition simply pointed to Bailey's use of the phrase "predominant slope" and conclusorily asserted that it was equivalent to a weighted average. Appx212-214.

In its institution decision, the Board rejected Roofr's interpretation of the claims as requiring a weighted average because "[n]othing in the claims' plain language limits predominant pitch to a weighted average." Appx250. Yet, the Board determined that Bailey's disclosure was nevertheless "sufficient," and that, even if the claims required a weighted average, a skilled artisan would have somehow understood that Bailey's "broad reference to a pitch calculation would include pitch weighted averages." Appx251 (cleaned up). The Board thus instituted review.

**2.** During the course of trial, Roofr backed away from its narrow reading of the claims as requiring a weighted average, and the parties ultimately settled on a common understanding of what "predominant pitch" means: "a single value that represents the pitches for the entire roof" such that it "account[s] for the entirety of the roof." Appx511(31:13-15); Appx90; Appx1540(¶94); Appx4970-4971(¶33). In other words, while a "predominant pitch" need not be a weighted average, it must account, in some fashion, for the pitch of each roof section.

Bailey, Pictometry argued, does not disclose the claimed "predominant pitch." Bailey is silent as to how its predominant slope is determined, and a skilled artisan would have thus interpreted Bailey's predominant slope consistent with the plain-English meaning of "predominant"—i.e., the slope corresponding to the most-common pitch associated with the majority of the roof's area, which is different than the '538 patent's predominant pitch. Appx343-344; Appx430-438. In Appendix B, moreover, Bailey states that pitches for individual roof sections should be used to calculate section areas before being combined, which is also different than the claimed predominant pitch. Appx332-334; Appx338; *see generally* Appx329-339; Appx4968-4973(¶¶30-38).

Despite all this, Roofr maintained that Bailey's "predominant slope" is equivalent to the '538 patent's "predominant pitch." *See* Appx394-404. According to Roofr, "whether or not Bailey teaches" details about what the predominant slope

is or how it is determined "has no bearing" on Roofr's invalidity challenge since the claims do not require "a particular technique or method" for determining predominant pitch. Appx404.

**3.** In its final written decision, the Board determined that Bailey's "predominant slope" is the claimed "predominant pitch." But, unlike in its institution decision, the Board did not find that Bailey's predominant slope discloses a weighted average. In fact, the Board did not make an affirmative finding at all—it simply summarized Roofr's arguments without adopting or endorsing them. Appx7-10.

As best as Pictometry can tell, the Board assumed that, simply because the claim phrase ("predominant pitch") and Bailey's disclosure ("predominant slope") contain similar language, they must be the same in substance. But at no point did the Board review Bailey's disclosure to determine whether they are in fact the same. Indeed, the Board did not directly cite Bailey—or expressly rely on any expert testimony interpreting Bailey—in its analysis. Nor did the Board ever explain what it believed "predominant pitch" means, let alone apply the parties' agreed-upon interpretation of that phrase.

Instead, the Board spent all its analysis explaining why it believed Pictometry's arguments were wrong. Appx8-10. Despite acknowledging that Roofr had relied on Bailey alone for "determining 'predominant pitch,'" Appx8; Appx9,

the Board faulted Pictometry for "attack[ing] Bailey individually" rather than in combination with the primary references, Appx8. The Board also noted that, even if Bailey's Appendix B "teaches using actual individual slopes rather than predominant slope," that disclosure "does not teach away" from using a predominant slope because Appendix B does not expressly "criticize or counsel against using predominant slope." Appx9.

### B. The Board Determines that Weighted Averages Were Known, and thus Invalidates Dependent Claims 11 and 18.

**1.** Roofr's petition arguments with respect to dependent claims 11 and 18 were difficult to parse. On the one hand, consistent with its arguments for the independent claims, Roofr argued that Bailey expressly discloses a weighted average: "Bailey's disclosure of a single 'predominant' or 'primary' pitch value is a weighted average pitch value that accounts for the amount of surface area taken up by roof facets[.]" Appx119. On the other hand, Roofr elsewhere argued that Bailey merely "renders obvious" the "weighted average" limitations of claims 11 and 18. Appx118; *see generally* Appx115-121; Appx128-129; Appx149; Appx155; Appx406. As explained above, moreover, Roofr ultimately abandoned its argument that Bailey expressly discloses a weighted average.

To support its obviousness argument, Roofr cited a 2010 RSMeans Illustrated Construction Dictionary not included in Roofr's unpatentability grounds. The dictionary contains a definition of "weighted average" that says

nothing about roof pitch—let alone "predominant pitch"—but which notes that weighted averages were "believed to be more representative of the true mean than that obtained by straight averaging." Appx119-120 (quoting Appx1933). And, Roofr argued, "there are only a finite number of ways to calculate a single pitch value (predominant pitch) from a plurality of pitch values," including a weighted average. Appx121; Appx404-409.

Pictometry responded that, even if the dictionary were probative as to why a skilled artisan would use a weighted average over a straight average, Roofr never established that Bailey's predominant slope is a straight average. Appx442. Rather, as explained above, a skilled artisan would have understood Bailey's predominant slope to be the most-common pitch of the roof. Appx339-348; Appx4979-4991(¶¶51-70). Accordingly, the RSMeans Dictionary does not fill the gap between what Bailey discloses and what the claims require. Appx440-442.

Pictometry also showed that Roofr's arguments as to claim 18 were independently deficient. That claim requires the predominant pitch to be based on a weighted average of "pitch factors" (rather than "pitch values"). The primary disclosure on which Roofr relied for claim 18 is Bailey's table for converting pitch values to pitch factors, as well as a brief description about how to use pitch factors to determine roof area. Appx128-129 (quoting Appx1798(Tbl. 3)). But Roofr's expert conceded that Bailey's table "doesn't determine pitch" at all, much less by

averaging individual pitch factors. Appx5061-5062(66:21-67:3); *see also* Appx334-351; Appx443-444; Appx4992-4993(¶¶71-72).

**2.** As with its analysis for the other claims, the Board made no express finding that Bailey discloses or renders obvious the dependent claims' "weighted average" limitation under Roofr's invalidity theory. In fact, the Board did not even summarize Roofr's invalidity theory. Instead, the Board began its analysis by, once again, addressing Pictometry's arguments of patentability. *See* Appx10-11.

Although unclear, the Board seemed to agree with Pictometry that Bailey does not expressly disclose weighted averages—the Board's contrary statement in its institution decision notwithstanding—and relied instead on a theory of obviousness. But, rather than analyze Bailey, the Board focused exclusively on the RSMeans Construction Dictionary. Appx11. According to the Board, the dictionary establishes that a weighted average was a "known way of obtaining an average," and a skilled artisan would have been "motivated to use a weighted average to calculate Bailey's predominant slope" since a weighted average may be "more representative of the true mean than" a straight average. *Id.* (quoting Appx1933). But the Board never found that Bailey discloses a straight average. Nor did the Board address Pictometry's separate arguments with respect to claim 18.

Ultimately, the Board invalidated all claims of the '538 patent, leading to

this appeal.

## SUMMARY OF THE ARGUMENT

I. The Board's obviousness determination is procedurally and substantively flawed. Rather than make a finding that Bailey discloses the "predominant pitch" limitation of the '538 patent, the Board merely assumed it does simply because Bailey uses similar language ("predominant slope") as the '538 patent claims. The Board then required Pictometry to prove otherwise.

Not only did the Board impermissibly shift the burden of proof, it failed to apply the parties' agreed-upon interpretation of "predominant pitch" requiring a single pitch value that accounts for every section of the roof. Had the Board performed the correct legal analysis and considered whether Bailey in fact satisfies the agreed-upon interpretation of "predominant pitch," it would have concluded that Bailey does not. The record evidence establishes that Bailey uses the most-common pitch corresponding to a majority of a roof's area, which falls outside the scope of the claims and leads to a different area calculation than one using the claimed predominant pitch. Roofr thus failed to satisfy its burden to show that Bailey renders the claims obvious. The Court should reverse.

II. The Board independently erred with respect to dependent claims 11 and 18, which require that the predominant pitch comprise a weighted average. As to both claims, the Board once again erred by failing to make a finding that Bailey

discloses the "weighted average" limitation and by requiring Pictometry to prove otherwise. Even beyond that, the Board erred by placing dispositive weight on the RSMeans Construction Dictionary, as if it somehow cured Bailey's deficiencies. At most, the dictionary establishes that weighted averages were known and can, in some circumstances, be advantageous over straight averages. But Bailey does not disclose even straight averages. And the dictionary does nothing to fill the gap between what Bailey does disclose (a most-common pitch) and what the claims require (a weighted average of pitches). The dictionary is thus legally irrelevant.

As for claim 18—which requires a weighted average of pitch factors (rather than pitch values)—the Board erred by failing to address Pictometry's separate argument about Roofr's reliance on Bailey's slope-factor table. The table shows only how to convert a pitch value to a pitch factor, but, as Roofr's expert conceded, it does not show how to determine a predominant pitch or suggest that such a pitch should be determined by performing a weighted average of pitch factors. The Board did not grapple with this issue at all, instead assuming (incorrectly) that claims 11 and 18 necessarily fall together. That, too, was reversible error.

## STANDARDS OF REVIEW

The Board's rulings in formal adjudications such as IPRs are subject to the Administrative Procedure Act. *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1301 (Fed. Cir. 2016). The APA requires that the Court "hold unlawful and set aside

agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[]" or "without observance of procedure required by law[.]" 5 U.S.C. § 706(2). The Court reviews de novo whether the Board's procedures satisfy the APA. *EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341, 1345 (Fed. Cir. 2017).

Obviousness is a question of law based on underlying factual findings concerning, among other things, "the scope and content of the prior art." *Fanduel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1343 (Fed. Cir. 2020). The Board's legal determination of obviousness is reviewed de novo, while its underlying factual findings are reviewed for substantial evidence. *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1360-1361 (Fed. Cir. 2016). "Substantial evidence is more than a mere scintilla"—it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" based upon the "examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (cleaned up).

# ARGUMENT

## I. THE BOARD ERRED IN HOLDING THE ’538 PATENT CLAIMS OBVIOUS.

It would be difficult to affirm the Board’s finding that Bailey discloses the ’538 patent’s “predominant pitch” limitation since the Board never made such a finding. Rather, the Board jumped straight to a conclusion of obviousness based solely on the similarity in operative language used in the patent (“predominant pitch”) and Bailey (“predominant slope”). The Board did not analyze Bailey’s disclosure to determine whether they are in fact the same, nor did it apply the parties’ agreed-upon interpretation of “predominant pitch.” If all that were not bad enough, the Board then placed the burden on Pictometry to show why Bailey does *not* disclose the claimed “predominant pitch.”

As explained below, the Board’s analysis is legally flawed on multiple levels. The record evidence establishes that the ’538 patent’s “predominant pitch” and Bailey’s “predominant slope” are *not* the same. And, because substantial evidence does not support the Board’s obviousness conclusion under the proper legal framework, the Court should reverse.

### A. The Board’s Obviousness Conclusion Rests on Legal Error.

#### 1. The Board Failed to Make a Finding that Bailey Discloses the “Predominant Pitch” Limitation.

The Board’s failure to even articulate any finding as to *why* Bailey discloses the “predominant pitch” limitation constitutes a clear APA violation. Under the

APA, agencies must "provide an administrative record showing the evidence on which the findings are based, accompanied by the agency's reasoning in reaching its conclusions." *Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1370 (Fed. Cir. 2020) (cleaned up); 5 U.S.C. § 557(c)(3)(A). The requirement that an agency articulate its findings is foundational to the "reasoned decisionmaking" necessary for "honest and legitimate adjudication." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374, 379 (1998). It is also necessary to ensure that this Court can "perform meaningful review." *In re Sang-Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).

The corollary, then, is that the Board cannot merely "summarize and reject arguments without explaining why [it] accepts the prevailing argument." *In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016). Rather, the Board must "explain *why* it found [the prevailing] argument[] persuasive." *Alacritech*, 966 F.3d at 1371 (finding the Board violated the APA when it "briefly recit[ed] some of the parties' arguments in two terse paragraphs" and then "merely conclude[d]" that the limitation at issue was in the prior art); *Hill-Rom Servs., Inc. v. Matal*, 716 F. App'x 996, 1005 (Fed. Cir. 2017) (reversing Board's obviousness determination where it failed to articulate reasons why it agreed with the Examiner's rejections and instead faulted the patent owner for "not identify[ing] a defect in the Examiner's reasoning").

The Board failed to perform the required analysis here. The Board began (at Appx8) by summarizing Roofr's arguments. Then, without adopting or endorsing any of those arguments, the Board explained (at Appx8-10) why it found Pictometry's countervailing arguments unpersuasive. At no point in its analysis did the Board actually find that Bailey satisfies the "predominant pitch" limitation. Remarkably, the Board did not cite Bailey—at least not directly—anywhere in its analysis. *See* Appx8-10.

Nor did the Board explain *why* it accepted Roofr's argument. While the Board cited to portions of Roofr's petition when summarizing certain arguments, the Board "did not endorse, adopt, or otherwise suggest that it was persuaded by those arguments, much less explain why it found those arguments persuasive." *Alacritech*, 966 F.3d at 1371. At most, the Board simply said that it "disagree[d]" with *Pictometry's* countervailing arguments. Appx8; Appx9. Setting aside that the Board improperly shifted the burden of proof by requiring Pictometry to disprove unpatentability, *see infra* Section I.A.3, the Board's mere disagreement with Pictometry is not enough to sustain a conclusion of obviousness under the APA, *NuVasive*, 842 F.3d at 1383; *Alacritech*, 966 F.3d at 1371; *Hill-Rom*, 716 F. App'x at 1005.

The Board's highly truncated obviousness analysis gave "short shrift to the APA's requirement of reasoned decisionmaking." *Cross-Sound Ferry Servs., Inc.*

*v. I.C.C.*, 738 F.2d 481, 487 (D.C. Cir. 1984). For this reason alone, the Board's ruling cannot stand.

**2. The Board Failed to Apply the Parties' Agreed-Upon Interpretation of "Predominant Pitch."**

Even if the Board's analysis could be read to implicitly adopt Roofr's arguments (it cannot), the Board still legally erred by failing to apply the parties' shared interpretation of "predominant pitch."

By the time of the oral hearing below, all agreed that the claimed "predominant pitch" is (in Roofr's counsel's own words) "a single value that represents the pitches for the entire roof" such that it in some way "account[s] for the entirety of the roof." Appx511(31:13-15); Appx90 (petition arguing that "predominant pitch" accounts for all of the "pitch values of a roof"); Appx1540(¶94) (Roofr's expert arguing that "predominant pitch" must "account for all of the pitches of a roof"); Appx4970-4971(¶33) (Pictometry's expert agreeing that "predominant pitch" must account for "the entire roof"). For example, the '538 patent describes an embodiment in which the predominant pitch is "a weighted average of individual pitch factors for two or more portions of the roof." Appx36(12:12-14). The predominant pitch need not comprise a weighted average, to be sure, but it must account in some fashion for the pitch of every roof section.

And, even though the parties did not expressly propose a construction for

this claim phrase, they at least agreed that the predominant pitch is *not* simply the most-common pitch representing the majority of the roof's area.[5] As explained below, *see infra* Section I.B.1, that agreement was more than sufficient to resolve the patentability dispute in Pictometry's favor, *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) (claim terms need only be construed "to the extent necessary to resolve [a] controversy" between the parties).

But the Board nowhere applied the parties' agreed-upon interpretation of "predominant pitch" to the prior art. Nor did the Board explain what it believed the claim phrase means. Instead, the Board said that "no claim terms require express construction," Appx4, and assumed that simply because Bailey's "predominant slope" uses similar language to the claimed "predominant pitch," they must be the same in substance. That mode of analysis is legally erroneous.

It is well established that the scope of a patent's invention "is not the language" of its claims in vacuum, but rather "the subject matter thereby defined." *Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1341 (Fed. Cir. 2001) (cleaned up). As a prerequisite to a proper invalidity analysis, therefore, one must

---

[5] Indeed, Roofr argued in its petition that the claimed predominant pitch is limited to a weighted average. Appx69; Appx89-Appx90. That interpretation is wrong and was rejected by the Board, Appx250, but it shows that Roofr all along understood that the claimed predominant pitch must account for each roof section's pitch and is not simply the most-common pitch representing the majority of the roof's area.

ascertain the subject matter defined by the claims. *See TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1139 (Fed. Cir. 2004) ("Our validity analysis is a two-step procedure: The first step involves the proper interpretation of the claims." (cleaned up)). Indeed, "it is impossible to know exactly what the [prior art] must disclose" without knowing "the precise scope" of the relevant limitation in the first place. *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1319 (Fed. Cir. 2004).

By the same token, the scope of a prior-art reference's disclosure is not dictated by its language in vacuum, but rather the context in which the language appears. "[T]he meaning of … language," after all, "depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991). A hardware catalog's disclosure of a "washer," for example, is bound to be different than a "washer" disclosed in a magazine describing washing machines.

This is all to say that the mere fact that a prior-art reference uses the same or similar language as a challenged patent claim is not dispositive of invalidity. Rather, the correct inquiry is whether *a skilled artisan* would have understood the reference to be using the language *in the same context as the subject matter defined by claim*. Stated differently, "[d]evices in one machine may be called by the same name as those contained in another, and yet they may be quite unlike," and so, "[i]n determining about similarities and differences, courts of justice are not governed merely by the names of things; but they look at the machines and their

devices in the light of what they do[] … and find that a thing is substantially the same as another[.]" *Bates v. Coe*, 98 U.S. 31, 42 (1878).

This Court's decision in *InTouch Technologies, Inc. v. VGO Communications, Inc.*, 751 F.3d 1327 (Fed. Cir. 2014), illustrates the point. There, the district court narrowly construed "an arbitrator" in a claim reciting a robot system as a particular device that determines which user has exclusive control over the robot. *Id.* at 1339. The jury then found the claim invalid over a prior-art reference disclosing a mechanism for performing "arbitration" of a micro-robotic swarm, and the district court thereafter denied the patentee's JMOL motion. *Id.* at 1349.

This Court reversed. Even though the prior-art reference "include[d] the term 'arbitration,'" the similarity in language across the reference and the challenged claim was "insufficient to permit the conclusion that [the reference] refer[red] to the same *type* of arbitration at issue" in the claim. *Id.* at 1350. Rather, a more fulsome analysis with due consideration of the claim term's meaning and the prior-art reference's context was required. Performing that analysis, the Court concluded that the prior-art reference did not disclose the claimed arbitration because, although the reference's arbitrator resolved conflicts, it did "not determine which users may exclusively control an individual robot," as required by the district court's construction. *Id.*

This is not to say that a prior-art reference's use of language that is similar to claim language is categorically insufficient to establish invalidity. But, where, as here, a claim term has a specific meaning that departs from its plain-English meaning, a more probing, contextual invalidity analysis is required. *Id.*; *cf. Plastic Omnium Advanced Innovation & Research v. Donghee Am., Inc.*, 943 F.3d 929, 935-936 (Fed. Cir. 2019) ("[D]espite the fact that [the defendant's] product literature uses the term 'parison' … , it does not depict an 'extruded parison' as defined by the patentee acting as its own lexicographer and construed by the district court . …").

Here, the Board did not perform such an analysis. Whereas the plain-English meaning of "predominant pitch" brings to mind the most-common pitch representing the majority of the roof's area, the parties agreed that the '538 patent uses the phrase to account for each section's pitch. Appx4988(¶67). The Board failed to apply that agreed-upon meaning and, consequently, failed to account for the subject matter defined by the claims.[6] The Board likewise never looked under

---

[6] The Board need not always accept a construction that is agreed upon by the parties. But, to the extent Board here believed that the points of agreement were insufficient to resolve the parties' patentability dispute or that the agreed-upon construction was incorrect, it should have said so and construed the term itself. *See Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375 (Fed. Cir. 2017) ("Just as district courts must, when the parties raise an actual dispute regarding the proper scope of ... claims, ... resolve that dispute, the Board also must

Bailey's hood to assure itself that Bailey's "predominant slope" is indeed the same as the claimed "predominant pitch." On the contrary, as explained above, the Board did not directly cite Bailey in its invalidity analysis.

The Board's invalidity analysis (or lack thereof) is fundamentally flawed, which provides another basis to at least vacate the Board's ruling.

**3. The Board Improperly Shifted the Burden to Pictometry to Prove the Claims Nonobvious.**

The two legal errors described above led to a third error: by failing to perform an affirmative analysis as to why Bailey satisfies the "predominant pitch" limitation, and instead requiring Pictometry to show otherwise, the Board impermissibly shifted the burden of proof.

By statute, an IPR "petitioner shall have the burden of proving a proposition of unpatentability." 35 U.S.C. § 316(e); *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1296 (Fed. Cir. 2017) (en banc). That burden "never shifts to the patentee." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1375 (Fed. Cir. 2016) (cleaned up). Likewise, as a matter of basic obviousness law, the patent challenger at all times bears the burden of persuasion to prove the claims obvious. *Id.* at 1376.

This Court's *Magnum Oil* decision is instructive. There, the Board

resolve such disputes in the context of IPRs." (cleaned up)); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1323-1324 (Fed. Cir. 2008) (tribunals have "an independent obligation to construe the terms of a patent" to resolve a dispute).

"assumed, without deciding," that the petitioner's argument that the prior art taught a disputed claim limitation was correct. *Id.* at 1378. The Board then faulted the patentee for "fail[ing] to account" for the petitioner's argument. *Id.* This Court reversed: by requiring the patentee "to rebut the position of the petitioner[] … and to prove nonobviousness of the claimed invention," the Board impermissibly shifted the burden of proof. *Id.*

That is what the Board did here. After having assumed that Bailey's "predominant slope" is the claimed "predominant pitch" simply because they use similar language, the Board focused on why, in its view, Pictometry had failed to rebut such an assumption. *See* Appx8-10. That approach to obviousness is legally improper and cannot stand.

* * *

Any one of the legal errors described above necessitates at least vacatur of the Board's ruling. But the Court can and should go further and reverse outright because, as explained below, the Board's ruling is not supported by substantial evidence under the correct legal framework.

### B. Under the Correct Legal Framework, Substantial Evidence Does Not Support the Board's Finding that Bailey Discloses the "Predominant Pitch" Limitation.

Had Board performed the correct legal analysis, it would have applied the parties' agreed-upon interpretation of "predominant pitch" requiring the

predominant pitch to be representative of each roof section's pitch. And had it done that, the Board would have concluded that Bailey's "predominant slope" does not comport with such a requirement. Rather, Bailey's predominant slope is simply the most-common pitch representing the majority of the roof's area, which leads to a different area calculation than one using the claimed predominant pitch. Accordingly, just like *InTouch*, the Board should have concluded that Roofr failed to satisfy its burden to show that Bailey satisfies the claim limitation. 751 F.3d at 1350.

The Board's contrary determination is not supported by substantial evidence—in fact, the Board did not directly cite to *any* evidence in its invalidity analysis. And the Board's rejection of Pictometry's countervailing arguments is based on a misapprehension of both Roofr's obviousness combination and invalidity law.

#### 1. Bailey's Passing Reference to Measuring a "Predominant Slope" Does Not Satisfy "Determin[ing] a … Predominant Pitch."

Bailey refers to "predominant slope" in just a single sentence of its 150-page report. It does so, *not* in the context of determining roof area, but in the context of describing a sample worksheet that "simplifies the task of collecting the inventory data for a roof section and ensures uniformity in reporting terminology." Appx1673. That worksheet is shown in Bailey's Chapter 2:

| ROOF SECTION IDENTIFICATION WORKSHEET | | AGENCY/INST.: Example | |
|---|---|---|---|
| DATE: JUN/ 1999 | BLDG. NO.: 1253 | SECTION ID: A | AREA: 2813 SF |
| OCCUPANCY: | YEAR ORIG. CONST.: ____ | | YEAR LAST REPLACED: ____ |

**10 GENERAL**

**11 TYPE (check all):**

X GABLE
X HIP
__ GAMBREL
__ SHED
__ DOME
__ BARREL
__ OTHER

**12 PERIMETER (check all):**

| | | | | | |
|---|---|---|---|---|---|
| PARAPET | ____ LF | FIREWALL | ____ LF | RIDGE | 69 LF |
| ROOF EDGE | 234 LF | HIP | 116 LF | OTHER | ____ LF |
| ADJACENT WALL | ____ LF | VALLEY | 70 LF | | |

....

**32 ATTACHMENT SURFACE (if applicable):**

__ WOOD FIBER
__ PLYWOOD
__ WOOD BOARDS
__ WOOD BATTENS
__ METAL PURLINS
__ OTHER
__ UNKNOWN

**33 SLOPE (primary): 4 IN 12**

**34 DRAINAGE (check all):**

__ INTERIOR DRAINS
__ INTERIOR GUTTERS
X GUTTERS & DOWNSPOUTS
__ SCUPPERS
__ ADJACENT ROOF SECTIONS
__ SCUPPERS W/LEADER & DOWNSPOUTS
__ OVERFLOW SCUPPERS
__ ROOF EDGE
__ OTHER

Appx1675-1677(Fig. 4) (annotated and excerpted). Bailey elsewhere refers to this "primary" slope as a "predominant slope":

> *Section 33 – Slope*. The predominant slope of the roof section. The roof plan will generally indicate the slope (e.g., 4 in. in 12). If the slope is not noted on the roof plan, the section drawings may indicate the slope. If such information is not available, field measurement will be required (use the method in Appendix B).

Appx1678. This brief description hardly establishes that the slope depicted in box 33 of Bailey's worksheet represents a pitch value accounting for all roof

sections, as the parties' agreed-upon interpretation requires.

To start, the description nowhere explains what "predominant slope" means or how it is determined. Instead, the description merely states that an already-determined "slope"—however it is determined—can be "noted" or "indicat[ed]" on roof plans or drawings. Indeed, Roofr's own expert testified that Bailey "doesn't give … an exact formula or anything of that nature on how to calculate" the predominant slope. Appx5049-5050(54:17-55:4). Nor does the description above suggest that the predominant slope is akin to a weighted average. Bailey is simply silent on that score, and "[s]ilence is generally not disclosure." *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1017 (Fed. Cir. 2022); *International Business Machs. Corp. v. Iancu*, 759 F. App'x 1002, 1011 (Fed. Cir. 2019) (noting that a prior-art reference's "silence" is insufficient for a petitioner "to meet its burden to prove" unpatentability).

The record establishes that a skilled artisan would have understood that Bailey's "predominant slope" is *not* a pitch value reflecting the pitches of all roof sections, but rather the most-common pitch. As all agree, "predominant slope" is not a term of art, and both experts testified that the plain-English meaning of the word "predominant" conveys the most "prominent" or "main" pitch "cover[ing] the majority of the roof[.]" Appx5048(53:4-7) (Roof's expert); Appx4988(¶67) (Pictometry's expert testifying that the plain-English meaning of "predominant

slope" as used in Bailey is the "most frequent or common" pitch); Appx5997 (dictionary defining "predominant" to mean "most frequent or common"); Appx406. That understanding is consistent with the fact that the worksheet depicted above itself uses the word "primary" to describe the slope. As Roofr's expert explained, "primary," like "predominant," conveys the "the prominent" or "main" pitch of the roof. Appx5048(53:2-11).

This understanding is also in keeping with Bailey's goal of manually collecting a large amount of data quickly. Appx5051(56:4-11). To accomplish that goal without the advent of computer automation and aerial-image analysis, Bailey takes a shortcut: use the most-common pitch in lieu of measuring each roof section's individual pitch. That approach, Pictometry's expert explained, "increases the speed of estimation and requires fewer field measurements." Appx4988-4989(¶68). The '538 patent, by contrast, is not constrained in the same way and does not require such shortcuts.

If Bailey's predominant slope *did* account for the pitch of each and every roof section, an engineer would be required to measure each section's pitch, which, in turn, would undermine Bailey's purpose of optimizing efficiency in the data-collection process. A skilled artisan would not read Bailey that way. Appx4988-4991(¶¶68-70).

To be clear, the difference in Bailey's "predominant slope" and the

’538 patent’s “predominant pitch” is not just academic or semantic—it leads to different results. Consider, for example, a roof having a pitch factor of 1.1 across 60% of its surface, a pitch factor of 1.2 across 30% of its surface, and a pitch factor of 1.3 across 10% of its surface. Bailey’s predominant slope would be 1.1 because that is the pitch corresponding to the majority of the roof’s area—the other pitch factors would not be accounted for at all. The ’538 patent’s “predominant pitch,” by contrast, would account for those other pitch factors. For example, if the predominant pitch is a weighted average of pitch values, the predominant pitch would be 1.41 (1.1 *x* 0.60 + 1.2 *x* 0.30 + 1.3 *x* 0.10), which is much larger than the value that Bailey determines. That, in turn, would lead to a larger value for the total estimated area. In other words, the difference between the ’538 patent’s “predominant pitch” and Bailey’s Chapter 2 “primary slope” matters.

Roofr’s petition also relied heavily on Bailey’s Appendix B. *See, e.g.*, Appx99-Appx102. But Appendix B actually undermines Roofr’s position. Roofr’s expert conceded that Appendix B does not determine predominant slope at all and instead shows “how to calculate … the individual areas” using each section’s pitch “for each exposure.” Appx5058-5059(63:19-64:14); Appx1682. In fact, the pitch values described in Bailey’s Appendix B “are not combined until” *after* “the true roof areas have been determined.” Appx1796; Appx4970-4971(¶33); Appx5058-5059(63:19-64:14). Thus, if the “predominant slope” referenced in Bailey’s

Chapter 2 is determined using the techniques described in Appendix B—as the block-quoted description above suggests it can be—then the slope is indisputably *not* a “predominant pitch.”

In the end, neither Bailey’s Chapter 2 nor Bailey’s Appendix B satisfies the “predominant pitch” limitation. Roofr certainly never proved otherwise.

#### 2. The Board’s Reasons for Rejecting Pictometry’s Arguments Misapprehend Both Roofr’s Obviousness Combination and the Law.

Substantial evidence does not support the Board’s contrary conclusion. In fact, the Board did not rely on *any* evidence that could support such a conclusion. As noted above, the Board did not directly cite Bailey. Nor did the Board directly cite Roofr’s expert testimony in the analysis section of its decision. *See* Appx8-10.

To be sure, the Board cited three paragraphs of expert testimony while recounting Roofr’s arguments, Appx8 (citing Appx1513-1515(¶¶43-45)), but those paragraphs do not support the Board’s obviousness ruling. They address a purported motivation to combine Bailey with the primary references, not the antecedent issue of whether Bailey discloses the claimed “predominant pitch” in the first place. In fact, the cited testimony is *inconsistent with* the Board’s ruling. Paragraph 44 of Roofr’s expert declaration states that Bailey discloses “a weighted average of roof pitches.” Appx1513-1514(¶44). But Roofr disavowed that argument during the IPR, and the Board implicitly rejected the argument as

evidenced by the fact that the Board relied on an obviousness theory to satisfy the "weighted average" limitations in dependent claims 11 and 18 rather than on any express disclosure in Bailey. *See infra* Section II.A. Thus, the cited paragraphs of expert testimony do not support the Board's ruling.[7]

Rather than grappling with Pictometry's arguments based on the record evidence, the Board dismissed the arguments on two primary grounds. First, the Board faulted Pictometry for "attack[ing] Bailey individually, rather than the combined teachings of Bailey" and the primary references (Pershing-789 and Kennedy). Appx8. According to the Board, Roofr did not rely on Bailey "for the claimed area determination," and so it was improper to attack Bailey for that limitation. Appx9.

That is a non-sequitur. Regardless of whether Roofr relied on the combination of Bailey and Pershing-789/Kennedy for determining the area of a roof using predominant pitch, Roofr indisputably relied *only on Bailey for determining predominant pitch*. *See* Appx89 ("A POSITA would have been motivated to incorporate Bailey's predominant pitch estimation into Pershing-

---

[7] As Pictometry showed, moreover, Roofr's expert declaration parroted the petition verbatim and should not have been given any weight. Appx205; Appx213; Appx363-367; Appx440-442; *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019) ("[C]onclusory expert testimony is inadequate to support an obviousness determination.").

789 … .”); Appx89-90 (referring to “including Bailey’s predominant pitch” in Pershing-789); Appx90 (arguing that a skilled artisan would “incorporate Bailey’s predominant pitch measurement into Pershing-789’s system”); Appx116 (“Bailey expressly discloses the claimed ‘predominant pitch.’”); *see also* Appx134; Appx398. The Board itself acknowledged as much elsewhere in its decision. *See* Appx7 (“Petitioner relies on Bailey for teaching the claimed ‘predominant pitch.’”); Appx8 (same); *see also* Appx9; Appx447; Appx506(26:6-7).

Thus, it was incumbent upon the Board to make a finding that Bailey actually “determines” a predominant pitch. The Board never made such a finding. *Supra* Section I.A.1. And the Board could not have made such a finding because Roofr failed to show that Bailey determines a single pitch value that accounts for all roof sections. *Supra* Section I.B.1. The “combined teachings” of Bailey with Pershing-789/Kennedy do not cure that deficiency.

Second, the Board faulted Pictometry for addressing Bailey’s Appendix B. The Board reasoned that Appendix B does “not teach away” from determining a predominant pitch because it “does not criticize or counsel against” doing so and, instead, merely provides an alternative to the method for determining pitch disclosed in Chapter 2. Appx9. In the Board’s view, therefore, Appendix B is irrelevant to the invalidity analysis.

This reasoning fails on multiple levels. As an initial matter, *Roofr’s petition*

cited Bailey's Appendix B. *See* Appx99-102. Pictometry simply responded to Roofr's arguments on this score. It is unclear how the Board could have faulted Pictometry for addressing the very disclosure on which Roofr—the party bearing the burden of proof—relied.

In any event, the Board's statement about Appendix B not teaching away is misplaced. For one thing, it is wrong as a matter of law—this Court has made clear that, "*even if a reference is not found to teach away*, its statements regarding preferences *are relevant* to a finding regarding whether a skilled artisan would be motivated to" modify the reference in the manner asserted. *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069 (Fed. Cir. 2018) (emphases added). That inquiry, moreover, requires viewing the reference "as a whole." *Impax Lab'ys Inc. v. Lannett Holdings Inc.*, 893 F.3d 1372, 1379 (Fed. Cir. 2018). Thus, Bailey's Appendix B is indeed highly relevant to a skilled artisan's interpretation of Chapter 2—particularly given that Appendix B is expressly cited in Chapter 2—and undermines the notion that a skilled artisan would read Chapter 2 as disclosing the claimed "predominant pitch."

More to the point, the Board's suggestion that Bailey's Appendix B describes a technique for determining pitch *as an alternative* to the method described in Chapter 2 is factually wrong. As Roofr's expert conceded, Chapter 2 does not explain how to determine predominant pitch at all—rather, it says that an

already-determined slope can be "indicat[ed]" or "noted" on drawings. Appx5049-5050(54:17-55:4); Appx1678. Thus, Appendix B provides the *only* disclosure for determining pitch. And it indisputably does not disclose the claimed "predominant pitch." The Board's misapprehension of both Bailey's Chapter 2 and Appendix B only further undermines the Board's obviousness conclusion.

* * *

In the end, Roofr failed to show—and could not show—that Bailey satisfies the "predominant pitch" limitation. And, under the proper legal framework, substantial evidence does not support the Board's contrary ruling. The Court should reverse the Board's ruling invalidating all claims of the '538 patent. *See Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*, 97 F.4th 882, 888 (Fed. Cir. 2024).

## II. THE BOARD INDEPENDENTLY ERRED IN HOLDING DEPENDENT CLAIMS 11 AND 18 OBVIOUS.

If the Court agrees with Pictometry, the Court can uphold all claims of the '538 patent without separately addressing claims 11 and 18. In any event, the Board independently erred with respect to those claims.

Claims 11 and 18 require the predominant pitch to be based on a "weighted average." Appx38(16:15-23); Appx39(17:16-18). But, as with the "predominant pitch" limitation, the Board nowhere articulated an affirmative finding that Bailey discloses or renders obvious the "weighted average" limitation. Instead, the Board

shifted the burden, requiring Pictometry to prove otherwise. Appx10-11. That is legal error for the reasons explained above. *See supra* Section I.A.3.

Even beyond that threshold error, the Board erred by placing dispositive weight on a reference—the RSMeans Dictionary—that was not included in Roofr's obviousness combination and that does not mention a predominant pitch at all. The dictionary does not bridge the gap between the '538 patent claims and Bailey, and thus is not probative of obviousness. Still further, the Board never addressed Pictometry's claim 18-specific arguments. Any one of these errors requires at least vacatur. But, because substantial evidence does not support the Board's ruling, the Court should reverse outright.

### A. Bailey Indisputably Does Not Disclose Using a Weighted Average to Determine Predominant Pitch, and the Board Erred by Relying on the RSMeans Construction Dictionary to Fill the Gap.

Roofr's front-line position in its petition was that Bailey's predominant slope is itself "a weighted average of roof pitch values." Appx69; Appx89-Appx90; Appx99. But, as explained at length, Bailey does not disclose combining pitch values using a weighted average. On the contrary, Appendix B makes clear that pitch values "are *not* combined until the true roof areas" of each section "have been determined." Appx1796 (emphasis added). That is the opposite of a weighted average.

To its credit, the Board implicitly acknowledged that Bailey does not

disclose a weighted-average pitch value, as it relied solely on Roofr's backup obviousness theory to hold claims 11 and 18 unpatentable. Appx11 (concluding that the claims' "weighted-average feature" would have been "obvious to one skill in the art at the time of the '583 [*sic*] patent"). The Board thus recognized the gap between what Bailey discloses and what the claims require.

The problem is that, to fill the gap, the Board relied exclusively on the 2010 RSMeans Dictionary that Roofr had provided as an exhibit but not included in its obviousness grounds. The dictionary says nothing about predominant pitch, much less about using a weighted average of pitch values to calculate a predominant pitch. Rather, it simply states that weighted averages are "believed to be more representative of the true mean than that obtained by straight averaging." Appx1933. Relying solely on that disclosure, the Board concluded that using a weighted average was a "known way of obtaining an average" that is "more representative of the true mean than that obtained by straight averaging." Appx11. The Board then somehow jumped to the conclusion that a skilled artisan would have used a weighted average to calculate Bailey's predominant slope.[8]

---

[8] The Board made clear at the oral hearing that it was placing dispositive weight on the dictionary to bridge the gap. While questioning Roofr's counsel about claims 11 and 18, a panel member acknowledged that the claims require a weighted-average measurement but suggested that any lack of disclosure in Bailey was immaterial since "there's this other reference, this RSMeans Illustrated

That analysis is flawed. Setting aside that the dictionary was not included in Roofr's obviousness grounds, the dictionary was irrelevant to the obviousness inquiry. Obviousness, of course, must focus on "the differences between *the prior art* and claims at issue." *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) (emphasis added). Thus, the issue before the Board was whether a skilled artisan would have found it obvious to bridge the gap between what Bailey discloses and what the claims require (weighted average of pitches).

The dictionary is not probative as to that issue. Even if we assume that the definition is relevant to determining roof pitches—notwithstanding that the dictionary says nothing of pitches—at most, it merely bridges the gap between *straight averages* and weighted averages. But that is irrelevant because Bailey does not disclose using straight averages in the first place, nor did the Board ever find that it does. In short, there is no connection between the dictionary and Bailey. So the dictionary should not have received the dispositive weight the Board gave it. *See Qualtrics, LLC v. OpinionLab, Inc.*, 679 F. App'x 1016, 1020-1021 (Fed. Cir. 2017) (affirming nonobviousness ruling where background reference on which the petitioner relied "did not fill in the gaps found to exist in the teaching of" the

---

Construction Dictionary that discloses such a measurement." Appx511(31:2-7); Appx545-546(65:23-66:3) (same judge noting that the RSMeans Dictionary "describes doing a weighted average").

principal prior-art references or otherwise "inform[] a skilled artisan's understanding of" the principal references (cleaned up)).

To the extent the dictionary is relevant at all, it is only to show that weighted averages were known. But that is insufficient to establish a motivation to modify Bailey as a matter of law: "It does not suffice to meet the motivation to combine requirement to recognize that" an element was "known in the art." *Virtek Vision*, 97 F.4th at 886. Rather, "[a] reason for combining must exist." *Id.* at 888; *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1359 (Fed. Cir. 2020) ("The obviousness inquiry does not merely ask whether a skilled artisan could combine the references, but instead asks whether they would have been motivated to do so."); *cf. Arendi*, 832 F.3d at 1362 (noting that "common sense—whether to supply a motivation to combine or a missing limitation—cannot be used as a wholesale substitute for reasoned analysis and evidentiary support"). The Board never articulated a legally relevant reason to use a weighted average to calculate Bailey's predominant slope, and there is none.

Without the RSMeans Dictionary, there is nothing to prop up the Board's obviousness ruling as to claims 11 and 18. The Court should reverse.

### B. The Board Failed to Address Pictometry's Arguments as to Claim 18.

Finally, the Board independently erred with respect to claim 18. Unlike claim 11, which requires a weighted average of "pitch values" (the roof's rise divided by run) claim 18 requires a weighted average of "*pitch factors*" (the roof's hypotenuse divided by run). Appx39(17:16-18). *See supra* pp.8, 13.

To satisfy claim 18's "pitch factor" limitation, Roofr pointed to Bailey's table of pitch factors (which Bailey refers to as "area/rake factors"):

**(B) Conversion to Actual Area**

Now that the total projected horizontal areas for each roof slope have been calculated, the results can be converted to actual areas with the aid of Table 3. (To calculate the Actual Area, multiply the Horizontal Area by the Area/Rake Factor.)

① For the *9" slope* roof:
1,302 ft.$^2$ x 1.250 = 1,627.5 ft.$^2$

② For the *6" slope* roof:
643 ft.$^2$ x 1.118 = 718.8 ft.$^2$

After the horizontal areas have been converted to actual areas, the results can be added to obtain the total area of roof to be covered:

1,628 ft.$^2$ + 719 ft.$^2$ = 2,347 ft.$^2$

**Table 3: Area/Rake Conversion***

| Slope (inches per foot) | Area/Rake Factor |
|---|---|
| 4 | 1.054 |
| 5 | 1.083 |
| 6 | 1.118 |
| 7 | 1.157 |
| 8 | 1.202 |
| 9 | 1.250 |
| 10 | 1.302 |
| 11 | 1.356 |
| 12 | 1.414 |

*To use the table, simply multiply the projected horizontal area by the conversion factor for the appropriate roof slope. The result is the actual area of the roof.

Appx128-129 (excerpting Appx1798(Tbl. 3)). But that table simply demonstrates how to convert a pitch value (slope) to a pitch factor (area/rake factor). As Roofr's expert conceded, the table "doesn't determine pitch" at all, much less by averaging individual pitch factors. Appx5061-5062(66:21-67:3).

Nor does the text accompanying Bailey's table provide such disclosure. The

text merely describes how to use pitch factors to calculate *area* (i.e., by multiplying each section's pitch factor by the section's footprint). Appx4992-4993(¶¶71-72). But that is not what claim 18 requires. It requires using the pitch factors to calculate—using a weighted average—*a predominant pitch*. And even if it were obvious to calculate Bailey's predominant slope using a weighted average of pitch *values* (it is not), Roofr never showed that it also would have been obvious to calculate the slope using a weighted average of pitch *factors*.

The Board did not address this issue at all. While it acknowledged Pictometry's argument that "Bailey's slope-factor chart is insufficient" to satisfy claim 18, Appx10-11, the Board never squarely engaged with that argument, Appx11. The Board's failure to do so—or to even acknowledge that claims 11 and 18 differ in scope—constitutes an APA violation. *See Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 124 (Fed. Cir. 2022) (Board violated the APA by failing to "explicitly address" a party's arguments "or even implicitly explain" the Board's invalidity conclusion "in a way that fairly contemplates and resolves those arguments"); *In re Universal Elecs., Inc.*, 2023 WL 3335536, at *3-4 (Fed. Cir. 2023) ("We cannot conclude that the Board has done its job when it avoids [a party's] primary argument by omitting the disputed limitation from its obviousness analysis.").

Once again, the Board's error here provides a basis for at least vacatur. But,

because the record lacks substantial evidence that could possibly support Roofr's obviousness argument, the Court should reverse outright as to claim 18. *See Virtek Vision*, 97 F.4th at 888.

## CONCLUSION

Pictometry respectfully requests that the Court reverse the Board's ruling invalidating claims 1-18 of the '538 patent or, at the very least, vacate the ruling and remand for further proceedings.

February 10, 2025

Respectfully submitted,

*/s/ Richard A. Crudo*

Richard A. Crudo
Michael D. Specht
William H. Milliken
Jonathan Tuminaro
Richard M. Bemben
Steven M. Pappas
Jennifer Meyer Chagnon
STERNE KESSLER GOLDSTEIN & FOX PLLC
1101 K Street, NW
Floor 10
Washington, DC 20005
(202) 371-2600

*Counsel for Appellant*
*Pictometry International Corporation*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-2321

**Short Case Caption:** Pictometry International Corporation v. Roofr Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 11,326 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 02/10/2025

Signature: /s/ Richard A. Crudo

Name: Richard A. Crudo

Save for Filing

# ADDENDUM

Index of Addendum


| Filing date | Description | Appx Range |
|---|---|---|
| 7/11/2024 | Paper 41 - Final Written Decision | Appx1-Appx17 |
| | Exhibit 1001 - U.S. Patent No. 9,183,538 | Appx18-Appx39 |

Trials@uspto.gov
571-272-7822

Paper 41
Date: July 11, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

ROOFR INC.,
Petitioner,

v.

PICTOMETRY INTERNATIONAL CORP.,
Patent Owner

---

IPR2023-00436
Patent 9,183,538 B2

---

Before STACEY G. WHITE, GARTH D. BAER, and RUSSELL E. CASS, *Administrative Patent Judges.*

BAER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a*

# I. INTRODUCTION

## *A. Background*

Roofer Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–18 (the "challenged claims") of U.S. Patent No. 9,183,538 B2 (Ex. 1001, "the '538 patent"). Paper 5, 1 ("Pet."). Pursuant to 35 U.S.C. § 314, we instituted this *inter partes* review as to all of the challenged claims and all grounds raised in the Petition. Paper 14 ("Institution Decision"). Following institution, Patent Owner filed a Response. Paper 28 ("PO Resp."). Petitioner filed a Reply to Patent Owner's Response (Paper 33, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 34, "PO Sur-reply"). On April 23, 2024 we held an oral hearing. A transcript of the hearing is included in the record. Paper 40.

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision issued pursuant to 35 U.S.C. § 318(a). For the reasons we discuss below, we determine that Petitioner has proven by a preponderance of the evidence that the challenged claims are unpatentable.

## *B. Related Proceedings*

The parties identify the following related matter: *Pictometry International Corp. v. Roofr, Inc.*, 1:21-cv-01852 (D. Del). Pet. 88; Paper 3, 2.

## *C. The '538 Patent (Ex. 1001)*

The '538 patent is directed to determining an estimated roofing area based on the predominant pitch and the footprint of the roof. Ex. 1001, code (57). Figure 6 is reproduced below.




**FIG. 6**

Figure 6 is an "exemplary embodiment of a program logic." *Id*. at 1:56–57.

*D. Illustrative Claim*

Challenged claims 1, 13, and 14 are independent. Claim 1 is illustrative and is reproduced below.

> 1. One or more non-transitory computer readable medium storing a set of computer executable instructions for running on one or more computer systems that when executed cause the one or more computer systems to: identify a geographic location of a roof; determine a footprint and predominant pitch of the roof by analyzing one or more image showing the roof; determine an estimated roofing area of the roof based on the predominant pitch and the footprint of the roof; and generate a roof report for determination of an amount of materials needed for a construction project, wherein the roof report includes at least one image showing the roof and the estimated roofing area of the roof.

Ex. 1001, 15:21–32.

*E. Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability. Pet. vii.

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–5, 8–13 | 103(a)[1] | Pershing-789[2], Bailey[3] |
| 6, 7, 14–18 | 103(a) | Pershing-789, Bailey, Abhyanker[4] |
| 1–5, 8–13 | 103(a) | Kennedy[5], Bailey |
| 6, 7, 14–18 | 103(a) | Kennedy, Bailey, Abhyanker |

Petitioner submits a declaration from Tony Cummings. Ex. 1003.

## II. DISCUSSION

*A. Claim Construction*

Neither party proposes an express construction for any claim terms. Pet. 2; *see generally* PO. Resp. We agree that no claim terms require express construction for purposes of this Decision.

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), included revisions to 35 U.S.C. § 103 that became effective after the filing of the application that led to the challenged patent. Therefore, we apply the pre-AIA version of 35 U.S.C. § 103.

[2] US 2008/0262789 A1, Pub. Oct. 23, 2008 (Ex. 1004).

[3] *Roofer: Steep Roofing Inventory Procedures And Inspection And Distress Manual for Asphalt Shingle Roofs*, David M. Bailey, U.S. Army Corps of Engineers, CERL Tech. Rept. (December 1999) (Ex. 1010).

[4] US 2007/0220174 A1, Pub. Sep. 20, 2007 (Ex. 1005).

[5] US 2009/0304227 A1, Pub. Dec. 10, 2009 (Ex. 1009).

*B. Level of Ordinary Skill in the Art and Petitioner's Declarant*

Patent Owner contends one skilled in the art "would have had a Bachelor's degree in an academic area emphasizing construction, architecture, and/or engineering, or similar discipline, and at least two years of experience with roofing measurement and estimation, aerial imagery use in roofing estimation, and roofing measurement software." PO Resp. 4. Patent Owner's definition is substantively similar to Petitioner's. *See* Pet. 2 ("a person of ordinary skill in the art at the time of the alleged invention would have bachelor's degree in architecture or an equivalent with at least five years of experience performing roof estimation"). We agree with and adopt Patent Owner's definition with the added provision that, as we noted in our Institution Decision, "experience may compensate for formal education, and vice versa." Paper 14, 7.

Patent Owner does not contest that Petitioner's expert, Mr. Cummings, qualifies as a skilled artisan. *See* PO Resp. 39–47. Instead, Patent Owner contends we "should give significantly more weight" to its expert's testimony than to Petitioner's because its expert "has much more relevant experience" and Mr. Cunningham's opinions "are conclusory and merely repeat *verbatim* the arguments presented in the Petition." PO Resp. 39. We disagree. We do not find that Patent Owner's expert's opinions are entitled to significantly more weight than Petitioner's simply based on the experts' relative experience. Instead, in our analysis below, where necessary, we have evaluated both experts' opinions and we base our conclusions on the opinions' persuasiveness. In addition, we do not find it problematic that the Petition repeats certain portions of Petitioner's expert's testimony. Though portions of the Petition may be the same as Mr. Cummings's testimony, that does not by itself undermine the

testimony's persuasiveness or its status as evidence, nor does it mean Petitioner's arguments are conclusory, as Patent Owner suggests. *See* PO Resp. 43–47.

### *C. Description of Prior Art References*

#### *1. Pershing-789 (Ex. 1004)*

Pershing-789 teaches "[a] system that allows the remote measurement of the size, geometry, pitch and orientation of the roof sections of a building and then uses the information to provide an estimate to repair or replace the roof." Ex. 1004, code (57).

#### *2. Bailey (Ex. 1010)*

Bailey teaches methods for estimating area of a roof. Ex. 1010, 136–137. Bailey's method uses "the total projected horizontal areas" and "convert[s] to actual areas with the aid of" a table that indicates slope and an "Area/Rake Factor." *Id*. at 137. Bailey also teaches methods for collecting data about a roof, including the "predominant slope." *Id*. at 17.

#### *3. Kennedy (Ex. 1009)*

Kennedy teaches "[a] roof estimating software program [that] receives location information of a building in the selected region and then presents the aerial image files showing roof sections of building." Ex. 1009, code (57). Kennedy further teaches "a sizing tool for determining the size, geometry, and pitch of the roof sections of a building being displayed." *Id*.

#### *4. Abhyanker (Ex. 1005)*

Abhyanker teaches "marker placement in a mapping environment." Ex. 1005, code (57). Abhyanker teaches that "the method may include applying a drag and drop algorithm that enables the user to sequentially

and/or concurrently relocate markers in the mapping environment, iteratively performing additional verifications." *Id.* ¶ 11.

### *D. Obviousness Analysis*

#### *1. Obviousness of Claims 1–5 and 8–13 based on Pershing-789 and Bailey*

Petitioner contends that claims 1–5 and 8–13 would have been obvious over Pershing-789 and Bailey. Pet. 20–54. For the reasons explained below, we find Petitioner has shown by a preponderance of evidence that claims 1–5 and 8–13 would have been obvious over Pershing-789 and Bailey.

##### *a) Petitioner's Proposed Combination*

In its first ground, Petitioner relies on Pershing-789 for analyzing a roof's image to identify the roof's location, footprint, and pitch, and for then estimating the roof's area and generating a roof report. Pet. 6–8; *see id.* at 25–32, 34–36. Petitioner relies on Bailey for teaching the claimed "predominant pitch." *See id.* at 31–34. Petitioner argues that one of ordinary skill would have been motivated to modify Pershing-789's teachings with Bailey's because "[i]ncluding Bailey's predominant pitch would allow Pershing-789's system to estimate roof area accurately with simplified calculations." *Id.* at 21–22. Further, like Pershing-789, Bailey teaches a known, alternative way "to assess 'needed level of repair' of a roof." *Id.* at 22 (quoting Ex. 1010, 1, 10).

Patent Owner challenges several aspects of Petitioner's asserted combination. PO Resp. 9–36. We address those issues below.

*b) Analyzing an Image to Determine Roofing Area Based on Predominant Pitch and Footprint*

Claim 1 requires "determin[ing] a footprint and predominant pitch of the roof by analyzing one or more image showing the roof; [and] determin[ing] an estimated roofing area of the roof based on the predominant pitch and the footprint of the roof." Ex. 1001, 15:25–29. Independent claims 13 and 14 have similar limitations. *Id.* at 16:46–49, 16:62–65. Petitioner asserts that its proposed combination teaches this feature because Pershing-789 teaches analyzing a roof's image to identify the roof's footprint and pitch, and estimating the roof's area based on those features. Pet. 27–31. Although Pershing-789 teaches using "pitch" instead of the claimed "predominant pitch" to determine area, Petitioner explains that Bailey teaches determining "predominant pitch" and a skilled artisan would have been motivated to Bailey's predominant slope in calculating area because "it simplifies the calculation of roof estimates, and allows for a more streamlined, yet accurate, estimation." Pet. Reply 5; *see* Pet. 21–22, 31–34; Ex. 1003 ¶¶ 43–45.

Patent Owner challenges two aspects of Petitioner's analysis related to this limitation. First, Patent Owner argues that Petitioner's challenge fails because Bailey does not teach "using its 'predominant slope' in calculating the roof's area," and in fact teaches away from doing so by teaching "that area calculations should be performed separately for each slope." PO Resp. 12–13; *see id.* at 14, 16. We disagree with Patent Owner's argument because it attacks Bailey individually, rather than the combined teachings of Bailey and Pershing-789 that Petitioner asserts. *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981). Specifically, it is not necessary that Bailey teaches determining an estimated roofing area based on the roof's predominant pitch

and footprint because, as outlined above, Petitioner relies on the combined teachings of Pershing-789 and Bailey for the disputed area-determination feature. *See* Pet. 20–21, 27–34. That is, Petitioner relies on Bailey not for the claimed area determination, but only for teaching predominant pitch. *See id.* In addition, even if Patent Owner is correct that Baily elsewhere teaches using actual individual slopes rather than predominant slope to calculate a roof's area, that does not teach away from Petitioner's proposed combination because it does not criticize or counsel against using predominant slope instead. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) ("A reference does not teach away . . . if it merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the invention claimed.") (internal quotation marks omitted). Moreover, nothing in Bailey's teaching related to using actual slope measurements undermines Petitioner's explanation that one skilled in the art would implement a different feature in Bailey—Bailey's predominant slope—as a simplified, yet accurate way to calculate area. *See* Pet. 21–22.

Second, Patent Owner argues that Petitioner's challenge fails because Bailey "does not disclose or suggest determining a predominant pitch of a roof *by analyzing one or more images showing the roof*" as the challenged claims require. PO Resp. 17; *see id.* at 18–19. We disagree with this argument because it once again attacks Bailey individually, rather than the combined teachings of Bailey and Pershing-789 that Petitioner asserts. Specifically, it is not necessary that Bailey teaches analyzing roof images because Petitioner relies on Pershing-789, not Bailey, for that feature. *See* Pet. 2–28; Pet. Reply. 10–12. In addition, Petitioner's rationale, as outlined

above, explains why one skilled in the art would have combined Pershing-789's image analysis with Bailey's predominant-slope feature.

In light of Petitioner's analysis as outlined above, we agree with Petitioner that together, Pershing-789 and Bailey teach "determin[ing] a footprint and predominant pitch of the roof by analyzing one or more image showing the roof; [and] determin[ing] an estimated roofing area of the roof based on the predominant pitch and the footprint of the roof," as claimed. Further, given Petitioner's rationale as outlined above, Petitioner has articulated sufficient reasoning with rational underpinning to support its assertion that it would have been obvious to combine Bailey's predominant-slope teaching with Pershing-789's area calculation. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418, 419 (2007).

*c) Dependent Claims 11 and 18*

Dependent claims 11 and 18 require using a weighted average to determine predominant pitch. Specifically, dependent claim 11 requires that the claimed "predominant pitch" is calculated by "determining a plurality of pitch values with each pitch value associated with a portion of the roof" and "each pitch value is associated with an estimated percentage of roof area." Ex. 1001, 16:15–23. Dependent claim 18 requires that the claimed predominant pitch is based on a weighted average of individual pitch factors for two or more portions of the roof." *Id.* at 17:16–18.

Patent Owner asserts Petitioner's challenges to dependent claims 11 and 18 fail because Bailey does not describe or provide any details about how its predominant slope is calculated, and Bailey's '"predominant pitch' was not a term of art in the roofing industry" that a skilled artisan would know necessarily involves weighted averages. PO Resp. 23–28. Further,

Patent Owner asserts that Bailey's slope-factor chart is insufficient for the claimed feature because Bailey uses its slope factors to calculate area, but not to determine predominant pitch. *Id.* at 29–31.

We disagree with Patent Owner's argument because, beyond Bailey's disclosures, Petitioner presents evidence that adequately supports its challenge to the weighted-average feature in dependent claims 11 and 18. Specifically, Petitioner presents a 2010 "Construction Dictionary" that teaches "weighted average" was a known way of obtaining an average. Ex. 1013, 605; *see* Pet. 51–52; *id.* at 60 (Petitioner's claim 18 analysis citing its earlier analysis of claims 10 and 11). Petitioner also explains that one skilled in the art would have been motivated to use a weighted average to calculate Bailey's predominant slope because, as the dictionary explains, it is "more representative of the true mean than that obtained by straight averaging." Ex. 1013, 65; *see* Pet. 51–52. With this evidence, Petitioner has adequately supported its assertion that a skilled artisan "would have been familiar with the use of weighted averages generally to determine an average representative of a range of values," and "would have known that using a weighted average to determine a value representative of a range of source values leads to a more accurate result." Pet. Reply 15 (citing Ex. 1003 ¶ 97). Thus, Petitioner has shown that the weighted-average feature in dependent claims 11 and 18 would have been "nothing more than the application of a known technique to yield a predictable result" and thus obvious to one skilled in the art at the time of the '583 patent. *Id.* at 16.

*d) Footprint*

Independent claims 1, 13, and 14 require determining a roof's "footprint." Ex. 1001, 15:25–27, 16:46–47, 16:62–67. According to

Petitioner, "Pershing-789 teaches determining the claimed '***footprint***' of the roof by drawing two-dimensional boundaries/outlines of roof sections," as shown in Pershing-789's Figure 5E. Pet. 28. Figure 5E is reproduced below:




FIG. 5E

Figure 5E is an illustration from a report "showing the square footage of each roof section along with the total square foot area value." Ex. 1004 ¶ 28.

Patent Owner argues that Pershing-789's Figure 5E is not a footprint because "Figure 5E shows the total surface area of the example roof. But because the roof is pitched, the roof's total surface area is not the same as and does not indicate the roof's footprint, which is the roof's outline or boundary projected on the ground." PO Resp. 34–35 (citation omitted).

We agree with Petitioner that Pershing-789's Figure 5E teaches the claimed footprint. As Petitioner notes, "the '538 patent teaches that the 'footprint may provide a two-dimensional boundary and/or outline of the roof.'" Pet. 28 (quoting Ex. 1001, 12:8–9). Figure 5E shows just that—a two-dimensional boundary and/or outline of the roof. Although we agree with Patent Owner that the roof's surface area and its footprint are distinct, that does not mean that Figure 5E is not a footprint simply because it includes corresponding surface area values. Thus, for the reasons above, we agree with Petitioner that Pershing-789's Figure 5E teaches the claimed footprint. *See* Pet. 28–30.

*e) Additional Undisputed Elements and Summary for Ground 1*

Petitioner asserts Pershing-789 teaches the additional undisputed elements in independent claims 1, 13, and 14 including identifying a roof's location, analyzing roof images, determining roofing area, and generating a roof report. Pet. 25–31, 34–35; *see id*. at 53–54; 59–61. As outlined above, Petitioner relies on Bailey for teaching the claimed "predominant pitch." *See id*. at 31–34. Petitioner further asserts Pershing-789 teaches the additional dependent claim features such as contractor/customer contact information, multiple host systems, roof edges, 3-D roof information, oblique images, and boundary information. *Id.* at 36–61. Other than the arguments addressed above, Patent Owner does not additionally challenge

Petitioner's ground-1 obviousness analysis. We have reviewed Petitioner's arguments and evidence outlined above and, based on that analysis and for the reasons above, we find Petitioner has shown by a preponderance of the evidence that claims 1–5 and 8–13 would have been obvious over Pershing-789 and Bailey.

### 2. *Obviousness of Claims 6, 7, and 14–18 based on Pershing-789, Bailey, and Abhyanker*

In its second ground, Petitioner adds Abhyanker "to address the additional limitations of claims 6–7 and 14–18" including "allow[ing] users . . . to specifically designate the geographic position of a roof to be analyzed, and to include a subsequent user confirmation option to ensure that the correct roof is being analyzed." Pet. 54–55, *see id*. at 83. Petitioner explains that one skilled in the art would have been motivated to add Abhyanker's user inputs to promote the system's accuracy and add convenience. *Id*. at 55–56, 84–85. Other than as outlined above, Patent Owner does not additionally challenge Petitioner's ground-2 obviousness analysis. We have reviewed Petitioner's arguments and the underlying evidence cited in support, *see id.* at 54–61, and, based on that analysis and for the reasons above, we find Petitioner has shown by a preponderance of evidence that claims 6, 7, and 14–18 would have been obvious over Pershing-789, Bailey, and Abhyanker.

### 3. *Petitioner's Alternative Kennedy-based Grounds*

Petitioner asserts alternative grounds that also challenge claims 1–18, but with Kennedy as a primary reference instead of Pershing-789. *See* Pet. 61–87. Because we have already determined that Petitioner has demonstrated the unpatentability of claims 1–18 in its Pershing-789-related

grounds, we need not address Petitioner's additional contentions for the same claims based on Kennedy.

## III. CONCLUSION

For the foregoing reasons, we determine Petitioner has demonstrated by a preponderance of the evidence that claims 1–18 of the '538 patent are unpatentable. Our conclusions are summarized in the following table.

| **Claim(s)** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claims Shown Unpatentable** | **Claims Not shown Unpatentable** |
|---|---|---|---|---|
| 1–5, 8–13 | 103 | Pershing-789, Bailey | 1–5, 8–13 | |
| 6, 7, 14–18 | 103 | Pershing-789, Baily, Abhyanker, | 6, 7, 14–18 | |
| 1–5, 8–13 | 103 | Kennedy, Bailey[6] | | |
| 6, 7, 14–18 | 103 | Kennedy, Baily, Abhyanker[7] | | |
| **Overall Outcome** | | | 1–18 | |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has shown that claims 1–18 of the '538 patent are unpatentable; and

[6] As noted above, we do not reach this ground because we determine the same claims unpatentable over Pershing-789 and Bailey.

[7] As noted above, we do not reach this ground because we determine the same claims unpatentable over Pershing-789, Bailey, and Abhyanker.

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2

For PETITIONER:

James Glass
Sean GLoth
QUINN EMANUEL URQUHART & SULLIVAN, LLP
jimglass@quinnemanuel.com
seangloth@quinnemanuel.com

For PATENT OWNER:

Michael Specht
Jonathan Tuminaro
Richard Bemben
Jennifer Chagnon
Steven Pappas
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
mspecht-ptab@sternekessler.com
jtuminar-ptab@sternekessler.com
rbemben-ptab@sternekessler.com
jchagnon-ptab@sternekessler.com
spappas-ptab@sternekessler.com

US009183538B2

(12) **United States Patent**
**Thornberry et al.**

(10) **Patent No.: US 9,183,538 B2**
(45) **Date of Patent: Nov. 10, 2015**

(54) **METHOD AND SYSTEM FOR QUICK SQUARE ROOF REPORTING**

(75) Inventors: **Chris T. Thornberry**, Indianapolis, IN (US); **Dale R. Thornberry**, Carmel, IN (US)

(73) Assignee: **Pictometry International Corp.**, Rochester, NY (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 334 days.

(21) Appl. No.: **13/424,054**

(22) Filed: **Mar. 19, 2012**

(65) **Prior Publication Data**

US 2013/0246204 A1 Sep. 19, 2013

(51) **Int. Cl.**
***G06Q 30/00*** (2012.01)
***G06Q 10/10*** (2012.01)

(52) **U.S. Cl.**
CPC ....................................... ***G06Q 10/10*** (2013.01)

(58) **Field of Classification Search**
CPC ....................... G06Q 30/0621; G06Q 30/0641
USPC ....................................... 705/26.1, 26.5, 27.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,273,876 A 2/1942 Lutz et al.
3,153,784 A 10/1964 Petrides et al.
3,594,556 A 7/1971 Edwards
3,614,410 A 10/1971 Bailey
3,621,326 A 11/1971 Hobrough
3,661,061 A 5/1972 Tokarz
3,716,669 A 2/1973 Watanabe et al.
3,725,563 A 4/1973 Woycechowsky
3,864,513 A 2/1975 Halajian et al.
3,866,602 A 2/1975 Furihata
3,877,799 A 4/1975 O'Donnell
4,015,080 A 3/1977 Moore-Searson
4,044,879 A 8/1977 Stahl
4,184,711 A 1/1980 Wakimoto
4,240,108 A 12/1980 Levy
4,281,354 A 7/1981 Conte
4,344,683 A 8/1982 Stemme
4,360,876 A 11/1982 Girault et al.
4,382,678 A 5/1983 Thompson et al.

(Continued)

FOREIGN PATENT DOCUMENTS

AT 331204 T 7/2006
BR 0316110 9/2005

(Continued)

OTHER PUBLICATIONS

http://www.eagleview.com/Portals/0/PortalContent/EagleView-iPhone-Application-Guide.pdf, 2011.*

(Continued)

*Primary Examiner* — Matthew Zimmerman
(74) *Attorney, Agent, or Firm* — Dunlap Codding, P.C.

(57) **ABSTRACT**

A set of instructions stored on one or more computer readable medium for running on one or more computer systems is described herein. The set of instructions generally may include instructions for identifying a geographic location of a roof, instructions for determining contact information of one or more contractors within a region of interest of the geographic location of the roof, instructions for determining a footprint of the roof, instructions for determining predominant pitch of the roof, and/or instructions for determining an estimated roofing area based on the predominant pitch and the footprint of the roof.

**18 Claims, 9 Drawing Sheets**

**Slope Factor Chart**

| Pitch of Roof | 1:12 | 2:12 | 3:12 | 4:12 | 5:12 | 6:12 | 7:12 | 8:12 | 9:12 | 10:12 | 11:12 | 12:12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Slope Factor | 1.0035 | 1.0138 | 1.0308 | 1.0541 | 1.0833 | 1.1180 | 1.1577 | 1.2019 | 1.2500 | 1.3017 | 1.3566 | 1.4142 |

(A) x (Slope Factor) = (B)



(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 4,387,056 | A | 6/1983 | Stowe |
| 4,396,942 | A | 8/1983 | Gates |
| 4,463,380 | A | 7/1984 | Hooks |
| 4,489,322 | A | 12/1984 | Zulch et al. |
| 4,490,742 | A | 12/1984 | Wurtzinger |
| 4,491,399 | A | 1/1985 | Bell |
| 4,495,500 | A | 1/1985 | Vickers |
| 4,527,055 | A | 7/1985 | Harkless et al. |
| 4,543,603 | A | 9/1985 | Laures |
| 4,586,138 | A | 4/1986 | Mullenhoff et al. |
| 4,635,136 | A | 1/1987 | Ciampa et al. |
| 4,653,136 | A | 3/1987 | Denison |
| 4,653,316 | A | 3/1987 | Fukuhara |
| 4,673,988 | A | 6/1987 | Jansson et al. |
| 4,686,474 | A | 8/1987 | Olsen et al. |
| 4,688,092 | A | 8/1987 | Kamel et al. |
| 4,689,748 | A | 8/1987 | Hofmann |
| 4,707,698 | A | 11/1987 | Constant et al. |
| 4,758,850 | A | 7/1988 | Archdale et al. |
| 4,805,033 | A | 2/1989 | Nishikawa |
| 4,807,024 | A | 2/1989 | Mclaurin et al. |
| 4,814,711 | A | 3/1989 | Olsen et al. |
| 4,814,896 | A | 3/1989 | Heitzman et al. |
| 4,843,463 | A | 6/1989 | Michetti |
| 4,899,296 | A | 2/1990 | Khattak |
| 4,906,198 | A | 3/1990 | Cosimano et al. |
| 4,953,227 | A | 8/1990 | Katsuma et al. |
| 4,956,872 | A | 9/1990 | Kimura |
| 5,034,812 | A | 7/1991 | Rawlings |
| 5,086,314 | A | 2/1992 | Aoki et al. |
| 5,121,222 | A | 6/1992 | Endoh et al. |
| 5,138,444 | A | 8/1992 | Hiramatsu |
| 5,155,597 | A | 10/1992 | Lareau et al. |
| 5,164,825 | A | 11/1992 | Kobayashi et al. |
| 5,166,789 | A | 11/1992 | Myrick |
| 5,191,174 | A | 3/1993 | Chang et al. |
| 5,200,793 | A | 4/1993 | Ulich et al. |
| 5,210,586 | A | 5/1993 | Grage et al. |
| 5,231,435 | A | 7/1993 | Blakely |
| 5,247,356 | A | 9/1993 | Ciampa |
| 5,251,037 | A | 10/1993 | Busenberg |
| 5,265,173 | A | 11/1993 | Griffin et al. |
| 5,267,042 | A | 11/1993 | Tsuchiya et al. |
| 5,270,756 | A | 12/1993 | Busenberg |
| 5,296,884 | A | 3/1994 | Honda et al. |
| 5,335,072 | A | 8/1994 | Tanaka et al. |
| 5,342,999 | A | 8/1994 | Frei et al. |
| 5,345,086 | A | 9/1994 | Bertram |
| 5,353,055 | A | 10/1994 | Hiramatsu |
| 5,369,443 | A | 11/1994 | Woodham |
| 5,402,170 | A | 3/1995 | Parulski et al. |
| 5,414,462 | A | 5/1995 | Veatch |
| 5,467,271 | A | 11/1995 | Abel et al. |
| 5,481,479 | A | 1/1996 | Wight et al. |
| 5,486,948 | A | 1/1996 | Imai et al. |
| 5,506,644 | A | 4/1996 | Suzuki et al. |
| 5,508,736 | A | 4/1996 | Cooper |
| 5,555,018 | A | 9/1996 | von Braun |
| 5,604,534 | A | 2/1997 | Hedges et al. |
| 5,617,224 | A | 4/1997 | Ichikawa et al. |
| 5,633,946 | A | 5/1997 | Lachinski et al. |
| 5,668,593 | A | 9/1997 | Lareau et al. |
| 5,677,515 | A | 10/1997 | Selk et al. |
| 5,798,786 | A | 8/1998 | Lareau et al. |
| 5,835,133 | A | 11/1998 | Moreton et al. |
| 5,841,574 | A | 11/1998 | Willey |
| 5,844,602 | A | 12/1998 | Lareau et al. |
| 5,852,753 | A | 12/1998 | Lo et al. |
| 5,894,323 | A | 4/1999 | Kain et al. |
| 5,899,945 | A | 5/1999 | Baylocq et al. |
| 5,963,664 | A | 10/1999 | Kumar et al. |
| 6,037,945 | A | 3/2000 | Loveland |
| 6,088,055 | A | 7/2000 | Lareau et al. |
| 6,094,215 | A | 7/2000 | Sundahl et al. |
| 6,097,854 | A | 8/2000 | Szeliski et al. |
| 6,108,032 | A | 8/2000 | Hoagland |
| 6,130,705 | A | 10/2000 | Lareau et al. |
| 6,157,747 | A | 12/2000 | Szeliski et al. |
| 6,167,300 | A | 12/2000 | Cherepenin et al. |
| 6,222,583 | B1 | 4/2001 | Matsumura et al. |
| 6,236,886 | B1 | 5/2001 | Cherepenin et al. |
| 6,256,057 | B1 | 7/2001 | Mathews et al. |
| 6,373,522 | B2 | 4/2002 | Mathews et al. |
| 6,421,610 | B1 | 7/2002 | Carroll et al. |
| 6,434,280 | B1 | 8/2002 | Peleg et al. |
| 6,597,818 | B2 | 7/2003 | Kumar et al. |
| 6,639,596 | B1 | 10/2003 | Shum et al. |
| 6,711,475 | B2 | 3/2004 | Murphy |
| 6,731,329 | B1 | 5/2004 | Feist et al. |
| 6,747,686 | B1 | 6/2004 | Bennett |
| 6,810,383 | B1 | 10/2004 | Loveland |
| 6,816,819 | B1 | 11/2004 | Loveland |
| 6,826,539 | B2 | 11/2004 | Loveland |
| 6,829,584 | B2 | 12/2004 | Loveland |
| 6,834,128 | B1 | 12/2004 | Altunbasak et al. |
| 6,876,763 | B2 | 4/2005 | Sorek et al. |
| 7,009,638 | B2 | 3/2006 | Gruber et al. |
| 7,018,050 | B2 | 3/2006 | Ulichney et al. |
| 7,046,401 | B2 | 5/2006 | Dufaux et al. |
| 7,061,650 | B2 | 6/2006 | Walmsley et al. |
| 7,065,260 | B2 | 6/2006 | Zhang et al. |
| 7,123,382 | B2 | 10/2006 | Walmsley et al. |
| 7,127,348 | B2 | 10/2006 | Smitherman et al. |
| 7,133,551 | B2 | 11/2006 | Chen |
| 7,142,984 | B2 | 11/2006 | Rahmes et al. |
| 7,184,072 | B1 | 2/2007 | Loewen et al. |
| 7,233,691 | B2 | 6/2007 | Setterholm |
| 7,262,790 | B2 | 8/2007 | Bakewell |
| 7,348,895 | B2 | 3/2008 | Lagassey |
| 7,424,133 | B2 | 9/2008 | Schultz et al. |
| 7,509,241 | B2 | 3/2009 | Guo |
| 7,728,833 | B2 | 6/2010 | Verma |
| 7,832,267 | B2 | 11/2010 | Woro |
| 7,844,499 | B2 | 11/2010 | Yahiro |
| 8,078,396 | B2 | 12/2011 | Meadow |
| 8,078,436 | B2 * | 12/2011 | Pershing et al. .................. 703/2 |
| 8,209,152 | B2 * | 6/2012 | Pershing ........................... 703/1 |
| 8,401,222 | B2 * | 3/2013 | Thornberry et al. .......... 382/100 |
| 8,705,843 | B2 | 4/2014 | Lieckfeldt |
| 2002/0041328 | A1 | 4/2002 | LeCompte et al. |
| 2002/0041717 | A1 | 4/2002 | Murata et al. |
| 2002/0087332 | A1 * | 7/2002 | Como ............................... 705/1 |
| 2002/0114536 | A1 | 8/2002 | Xiong et al. |
| 2003/0014224 | A1 | 1/2003 | Guo et al. |
| 2003/0043824 | A1 | 3/2003 | Remboski et al. |
| 2003/0088362 | A1 | 5/2003 | Melero et al. |
| 2003/0214585 | A1 | 11/2003 | Bakewell |
| 2004/0105090 | A1 | 6/2004 | Schultz et al. |
| 2004/0167709 | A1 | 8/2004 | Smitherman et al. |
| 2005/0073241 | A1 | 4/2005 | Yamauchi et al. |
| 2005/0088251 | A1 | 4/2005 | Matsumoto |
| 2005/0169521 | A1 | 8/2005 | Hel-Or |
| 2006/0028550 | A1 | 2/2006 | Palmer et al. |
| 2006/0036513 | A1 | 2/2006 | Whatley et al. |
| 2006/0092043 | A1 | 5/2006 | Lagassey |
| 2006/0238383 | A1 | 10/2006 | Kimchi et al. |
| 2006/0250515 | A1 | 11/2006 | Koseki et al. |
| 2007/0024612 | A1 | 2/2007 | Balfour |
| 2007/0046448 | A1 | 3/2007 | Smitherman |
| 2007/0237420 | A1 | 10/2007 | Steedly et al. |
| 2008/0120031 | A1 | 5/2008 | Rosenfeld et al. |
| 2008/0123994 | A1 | 5/2008 | Schultz et al. |
| 2009/0177458 | A1 | 7/2009 | Hochart et al. |
| 2009/0208095 | A1 | 8/2009 | Zebedin |
| 2009/0259568 | A1 | 10/2009 | Lee |
| 2009/0304227 | A1 | 12/2009 | Kennedy et al. |
| 2010/0110074 | A1 * | 5/2010 | Pershing ....................... 345/423 |
| 2010/0114537 | A1 * | 5/2010 | Pershing ........................... 703/1 |
| 2010/0179787 | A2 * | 7/2010 | Pershing et al. .............. 702/156 |
| 2010/0296693 | A1 * | 11/2010 | Thornberry et al. .......... 382/100 |
| 2011/0033110 | A1 | 2/2011 | Shimamura et al. |
| 2012/0179431 | A1 * | 7/2012 | Labrie et al. ...................... 703/1 |

(56) **References Cited**

U.S. PATENT DOCUMENTS

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CA | 2402234 | | 9/2000 |
| CA | 2505566 | | 5/2004 |
| CN | 1735897 | A | 2/2006 |
| DE | 60017384 | T | 3/2006 |
| DE | 60306301 | T | 11/2006 |
| EP | 1010966 | | 2/1999 |
| EP | 1180967 | | 2/2002 |
| EP | 1696204 | | 8/2006 |
| JP | 2001-306667 | A | 11/2001 |
| JP | 2002-123589 | A | 4/2002 |
| JP | 2003/317089 | A | 11/2003 |
| JP | 2006-031087 | A | 2/2006 |
| MX | PA05004987 | | 2/2006 |
| WO | WO99/18732 | | 4/1999 |
| WO | WO/00/53090 | | 9/2000 |
| WO | WO/2004/044692 | | 5/2004 |
| WO | WO/2005/088251 | | 9/2005 |
| WO | WO/2008/028040 | | 3/2008 |

OTHER PUBLICATIONS

Jan. 2010—http://aims.jocogov.org/Resources/Pictometry_Resources/POLQuickStart.pdf.*

Ackermann, Prospects of Kinematic GPS Aerial Triangulation, ITC Journal, 1992.

Ciampa, John A., "Pictometry Digital Video Mapping", SPIE, vol. 2598, pp. 140-148, 1995.

Ciampa, J. A., Oversee, Presented at Reconstruction After Urban earthquakes, Buffalo, NY, 1989.

Dunford et al., Remote Sensing for Rural Development Planning in Africa, The Journal for the International Institute for Aerial Survey and Earth Sciences, 2:99-108, 1983.

Gagnon, P.A., Agnard, J. P., Nolette, C., & Boulianne, M., "A Micro-Computer based General Photogrammetric System", Photogrammetric Engineering and Remote Sensing, vol. 56, No. 5., pp. 623-625, 1990.

Konecny, G., "Issues of Digital Mapping", Leibniz University Hannover, Germany, GIS Ostrava 2008, Ostrava Jan. 27-30, 2008, pp. 1-8.

Konecny, G., "Analytical Aerial Triangulation with Convergent Photography", Department of Surveying Engineering, University of New Brunswick, pp. 37-57, 1966.

Konecny, G., "Interior Orientation and Convergent Photography", Photogrammetric Engineering, pp. 625-634, 1965.

Graham, Lee A., "Airborne Video for Near-Real-Time Vegetation Mapping", Journal of Forestry, 8:28-32, 1993.

Graham, Horita TRG-50 SMPTE Time-Code Reader, Generator, Window Inserter, 1990.

Hess, L.L, et al., "Geocoded Digital Videography for Validation of Land Cover Mapping in the Amazon Basin", International Journal of Remote Sensing, vol. 23, No. 7, pp. 1527-1555, 2002.

Hinthorne, J., et al., "Image Processing in the Grass GIS", Geoscience and Remote Sensing Symposium, 4:2227-2229, 1991.

Imhof, Ralph K., "Mapping from Oblique Photographs", Manual of Photogrammetry, Chapter 18, 1966.

Jensen, John R., Introductory Digital Image Processing: A Remote Sensing Perspective, Prentice-Hall, 1986; 399 pages.

Lapine, Lewis A., "Practical Photogrammetric Control by Kinematic GPS", GPS World, 1(3):44-49, 1990.

Lapine, Lewis A., Airborne Kinematic GPS Positioning for Photogrammetry—The Determination of the Camera Exposure Station, Silver Spring, MD, 11 pages, at least as early as 2000.

Linden et al., Airborne Video Automated Processing, US Forest Service Internal report, Fort Collins, CO, 1993.

Myhre, Dick, "Airborne Video System Users Guide", USDA Forest Service, Forest Pest Management Applications Group, published by Management Assistance Corporation of America, 6 pages, 1992.

Myhre et al., "An Airborne Video System Developed Within Forest Pest Management—Status and Activities", 10 pages, 1992.

Myhre et al., "Airborne Videography—A Potential Tool for Resource Managers"—Proceedings: Resource Technology 90, 2nd International Symposium on Advanced Technology in Natural Resource Management, 5 pages, 1990.

Myhre et al., Aerial Photography for Forest Pest Management, Proceedings of Second Forest Service Remote Sensing Applications Conference, Slidell, Louisiana, 153-162, 1988.

Myhre et al., "Airborne Video Technology", Forest Pest Management/Methods Application Group, Fort Collins, CO, pp. 1-6, at least as early as Jul. 30, 2006.

Norton-Griffiths et al., 1982. "Sample surveys from light aircraft combining visual observations and very large scale color photography". University of Arizona Remote Sensing Newsletter 82-2:1-4.

Norton-Griffiths et al., "Aerial Point Sampling for Land Use Surveys", Journal of Biogeography, 15:149-156, 1988.

Novak, Rectification of Digital Imagery, Photogrammetric Engineering and Remote Sensing, 339-344, 1992.

Slaymaker, Dana M., "Point Sampling Surveys with GPS-logged Aerial Videography", Gap Bulletin No. 5, University of Idaho, http://www.gap.uidaho.edu/Bulletins/5/PSSwGPS.html, 1996.

Slaymaker, et al., "Madagascar Protected Areas Mapped with GPS-logged Aerial Video and 35mm Air Photos", Earth Observation magazine, vol. 9, No. 1, http://www.eomonline.com/Common/Archives/2000jan/00jan_tableofcontents.html, pp. 1-4, 2000.

Slaymaker, et al., "Cost-effective Determination of Biomass from Aerial Images", Lecture Notes in Computer Science, 1737:67-76, http://portal.acm.org/citation.cfm?id=648004.743267&coll=Guide&dl=, 1999.

Slaymaker, et al., "A System for Real-time Generation of Geo-referenced Terrain Models", 4232A-08, SPIE Enabling Technologies for Law Enforcement Boston, MA, ftp://vis-ftp.cs.umass.edu/Papers/schultz/spie2000.pdf, 2000.

Slaymaker, et al.,"Integrating Small Format Aerial Photography, Videography, and a Laser Profiler for Environmental Monitoring", In ISPRS WG III/1 Workshop on Integrated Sensor Calibration and Orientation, Portland, Maine, 1999.

Slaymaker, et al., "Calculating Forest Biomass With Small Format Aerial Photography, Videography and a Profiling Laser", In Proceedings of the 17th Biennial Workshop on Color Photography and Videography in Resource Assessment, Reno, NV, 1999.

Slaymaker et al., Mapping Deciduous Forests in Southern New England using Aerial Videography and Hyperclustered Multi-Temporal Landsat TM Imagery, Department of Forestry and Wildlife Management, University of Massachusetts, 1996.

Star et al., "Geographic Information Systems an Introduction", Prentice-Hall, 1990.

Tomasi et al., "Shape and Motion from Image Streams: a Factorization Method" —Full Report on the Orthographic Case, pp. 9795-9802, 1992.

Warren, Fire Mapping with the Fire Mousetrap, Aviation and Fire Management, Advanced Electronics System Development Group, USDA Forest Service, 1986.

Welch, R., "Desktop Mapping with Personal Computers", Photogrammetric Engineering and Remote Sensing, 1651-1662, 1989.

Westervelt, James, "Introduction to GRASS 4", pp. 1-25, 1991.

"RGB Spectrum Videographics Report, vol. 4, No. 1, McDonnell Douglas Integrates RGB Spectrum Systems in Helicopter Simulators", pp. 1-6, 1995.

RGB "Computer Wall", RGB Spectrum, 4 pages, 1995.

"The First Scan Converter with Digital Video Output", Introducing . . . The RGB/Videolink 1700D-1, RGB Spectrum, 2 pages, 1995.

ERDAS Field Guide, Version 7.4, A Manual for a commercial image processing system, 1990.

"Image Measurement and Aerial Photography", Magazine for all branches of Photogrammetry and its fringe areas, Organ of the German Photogrammetry Association, Berlin-Wilmersdorf, No. 1, 1958.

"Airvideo Analysis", MicroImages, Inc., Lincoln, NE, 1 page, Dec. 1992.

(56) **References Cited**

OTHER PUBLICATIONS

Zhu, Zhigang, Hanson, Allen R., "Mosaic-Based 3D Scene Representation and Rendering", Image Processing, 2005, ICIP 2005, IEEE International Conference on 1(2005).
Mostafa, et al., "Direct Positioning and Orientation Systems How do they Work? What is the Attainable Accuracy?", Proceeding, American Society of Photogrammetry and Remote Sensing Annual Meeting, St. Louis, MO, Apr. 24-27, 2001.
"POS AV" georeferenced by APPLANIX aided inertial technology, http://www.applanix.com/products/posav__index.php.
Mostafa, et al., "Ground Accuracy from Directly Georeferenced Imagery", Published in GIM International vol. 14 N. Dec. 12, 2000.
Mostafa, et al., "Airborne Direct Georeferencing of Frame Imagery: An Error Budget", The 3rd International Symposium on Mobile Mapping Technology, Cairo, Egypt, Jan. 3-5, 2001.
Mostafa, M.R. and Hutton, J., "Airborne Kinematic Positioning and Attitude Determination Without Base Stations", Proceedings, International Symposium on Kinematic Systems in Geodesy, Geomatics, and Navigation (KIS 2001) Banff, Alberta, Canada, Jun. 4-8, 2001.
Mostafa, et al., "Airborne DGPS Without Dedicated Base Stations for Mapping Applications", Proceedings of ION-GPS 2001, Salt Lake City, Utah, USA, Sep. 11-14.
Mostafa, "ISAT Direct Exterior Orientation QA/QC Strategy Using POS Data", Proceedings of OEEPE Workshop: Integrated Sensor Orientation, Hanover, Germany, Sep. 17-18, 2001.
Mostafa, "Camera/IMU Boresight Calibration: New Advances and Performance Analysis", Proceedings of the ASPRS Annual Meeting, Washington, D.C., Apr. 21-26, 2002.
Hiatt, "Sensor Integration Aids Mapping at Ground Zero", Photogrammetric Engineering and Remote Sensing, Sep. 2002, p. 877-878.
Mostafa, "Precision Aircraft GPS Positioning Using CORS", Photogrammetric Engineering and Remote Sensing, Nov. 2002, p. 1125-1126.
Mostafa, et al., System Performance Analysis of INS/DGPS Integrated System for Mobile Mapping System (MMS), Department of Geomatics Engineering, University of Calgary, Commission VI, WG VI/4, Mar. 2004.
Artes F., & Hutton, J., "GPS and Inertial Navigation Delivering", Sep. 2005, GEOconnexion International Magazine, p. 52-53, Sep. 2005.
"POS AV" APPLANIX, Product Outline, airborne@applanix.com, 3 pages, Mar. 28, 2007.
POSTrack, "Factsheet", APPLANIX, Ontario, Canada, www.applanix.com, Mar. 2007.
POS AV "Digital Frame Camera Applications", 3001 Inc., Brochure, 2007.
POS AV "Digital Scanner Applications", Earthdata Brochure, Mar. 2007.
POS AV "Film Camera Applications" AeroMap Brochure, Mar. 2007.
POS AV "LIDAR Applications" MD Atlantic Brochure, Mar. 2007.
POS AV "OEM System Specifications", 2005.
POS AV "Synthetic Aperture Radar Applications", Overview, Orbisat Brochure, Mar. 2007.
"POSTrack V5 Specifications" 2005.
"Remote Sensing for Resource Inventory Planning and Monitoring", Proceeding of the Second Forest Service Remote Sensing Applications Conference—Slidell, Louisiana and NSTL, Mississippi, Apr. 11-15, 1988.
"Protecting Natural Resources with Remote Sensing", Proceeding of the Third Forest Service Remote Sensing Applications Conference—Apr. 9-13, 1990.
Heipke, et al, "Test Goals and Test Set Up for the OEEPE Test—Integrated Sensor Orientation", 1999.
Kumar, et al., "Registration of Video to Georeferenced Imagery", Sarnoff Corporation, CN5300, Princeton, NJ, 1998.
McConnel, Proceedings Aerial Pest Detection and Monitoring Workshop—1994.pdf, USDA Forest Service Forest Pest Management, Northern Region, Intermountain region, Forest Insects and Diseases, Pacific Northwest Region.
"Standards for Digital Orthophotos", National Mapping Program Technical Instructions, US Department of the Interior, Dec. 1996.
Tao, "Mobile Mapping Technology for Road Network Data Acquisition", Journal of Geospatial Engineering, vol. 2, No. 2, pp. 1-13, 2000.
"Mobile Mapping Systems Lesson 4", Lesson 4 SURE 382 Geographic Information Systems II, pp. 1-29, Jul. 2, 2006.
Konecny, G., "Mechanische Radialtriangulation mit Konvergentaufnahmen", Bildmessung and Luftbildwesen, 1958, Nr. 1.
Myhre, "ASPRS/ACSM/RT 92" Technical papers, Washington, D.C., vol. 5 Resource Technology 92, Aug. 3-8, 1992.
Rattigan, "Towns get new view from above," *The Boston Globe*, Sep. 5, 2002.
Mostafa, et al., "Digital image georeferencing from a multiple camera system by GPS/INS," *ISP RS Journal of Photogrammetry & Remote Sensing*, 56(I): I-12, Jun. 2001.
Dillow, "Grin, or bare it, for aerial shot," *Orange County Register* (California), Feb. 25, 2001.
Anonymous, "Live automatic coordinates for aerial images," *Advanced Imaging*, 12(6):51, Jun. 1997.
Anonymous, "Pictometry and US Geological Survey announce—Cooperative Research and Development Agreement," Press Release published Oct. 20, 1999.
Miller, "Digital software gives small Arlington the Big Picture," *Government Computer NewsState & Local*, 7(12), Dec. 2001.
Garrett, "Pictometry: Aerial photography on steroids," *Law Enforcement Technology* 29(7):114-116, Jul. 2002.
Weaver, "County gets an eyeful," *The Post-Standard* (Syracuse, NY), May 18, 2002.
Reed, "Firm gets latitude to map O.C. in 3D," *Orange County Register* (California), Sep. 27, 2000.
Reyes, "Orange County freezes ambitious aerial photography project," *Los Angeles Times*, Oct. 16, 2000.
Aerowest Pricelist of Geodata as of Oct. 21, 2005 and translations to English 3 pages.
www.archive.org Web site showing archive of German AeroDach Web Site http://www.aerodach.de from Jun. 13, 2004 (retrieved Sep. 20, 2012) and translations to English 4 pages.
AeroDach®Online Roof Evaluation Standard Delivery Format and 3D Data File: Document Version 01.00.2002 with publication in 2002, 13 pages.
Noronha et al., "Detection and Modeling of Building from Multiple Aerial Images," Institute for Robotics and Intelligent Systems, University of Southern California, Nov. 27, 2001, 32 pages.
Applicad Reports dated Nov. 25, 1999-Mar. 9, 2005, 50 pages.
Applicad Sorcerer Guide, Version 3, Sep. 8, 1999, 142 pages.
Xactimate Claims Estimating Software archive from Feb. 12, 2010, 8 pages.
Bignone et al, Automatic Extraction of Generic House Roofs from High Resolution Aerial Imagery, Communication Technology Laboratory, Swiss Federal Institute of Technology ETH, CH-8092 Zurich, Switzerland, 12 pages, 1996.
Geospan 2007 Job proposal.
Greening et al., Commercial Applications of GPS-Assisted Photogrammetry, Presented at GIS/LIS Annual Conference and Exposition, Phoenix, AZ, Oct. 1994.
Korean Intellectual Property Office, International Search Report and Written Opinion, Mail Date Jul. 10, 2013.

* cited by examiner


100
124
122
104
124
122
122
104
126
132
130
128
134
106
104
102
108
110
114
112

FIG. 1


110
136
USER DATABASE
137
CONTRACTOR DATABASE
138
IMAGE DATABASE
139
PROGRAM LOGIC
130
140
ORDER DATABASE
141
IMAGE DATABASE
142
PROGRAM LOGIC

FIG. 2


144
145
OBTAIN USER INFORMATION
146
OBTAIN LOCATION VALIDATION
147
DETERMINE CONTRACTOR AVAILABILITY
148
CREATE ROOFING ORDER

FIG. 3


149
150
CUSTOMER REQUESTS ROOF REPORT
152
INFORMATION PROVIDED TO HOST SYSTEM
154
CUSTOMER NOTIFIED THAT HOST SYSTEM WILL DISTRIBUTE CONTACT INFORMATION
156
CUSTOMER PROVIDES CONTACT INFORMATION
158
CUSTOMER SELECTS DESIRED STRUCTURE
160
CUSTOMER VERIFIES IMAGE AND CONTACT INFORMATION AND SUBMITS ORDER
162
HOST SYSTEM RECEIVES ORDER
164
CUSTOMER RECEIVES CONFIRMATION OF SUCCESSFUL PLACEMENT OF ORDER

FIG. 4


169
170
IS MARKER OVER A VALID STRUCTURE ?
Yes
No
172
DOES SECOND HOST SYSTEM HAVE A LOCATION ?
Yes
No
174
CONTACT CUSTOMER REQUESTING RESUBMISSION
176
DOES SECOND HOST SYSTEM HAVE SUITABLE IMAGE ?
Yes
No
178
CONTACT CUSTOMER INFORMING NO SUITABLE IMAGERY
180
SECOND HOST SYSTEM PROCESSES AND REVIEWS ORDER
182
FIRST HOST SYSTEM RECEIVES AND DISTRIBUTES REPORT
184
CUSTOMER RECEIVES COPY OF COMPLETED ORDER
186
CONTRACTOR RECEIVES COPY OF COMPLETED ORDER

**FIG. 5**


188
190
HOST SYSTEM RECEIVES ROOF REQUEST ORDER
192
FOOTPRINT OF ROOF IS OBTAINED
194
PREDOMINANT PITCH VALUE DETERMINED
196
ROOFING AREA OBTAINED
198
ROOF REPORT PROVIDED

FIG. 6

**Slope Factor Chart**

| Pitch of Roof | 1:12 | 2:12 | 3:12 | 4:12 | 5:12 | 6:12 | 7:12 | 8:12 | 9:12 | 10:12 | 11:12 | 12:12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Slope Factor | 1.0035 | 1.0138 | 1.0308 | 1.0541 | 1.0833 | 1.1180 | 1.1577 | 1.2019 | 1.2500 | 1.3017 | 1.3566 | 1.4142 |

(A) x (Slope Factor) = (B)




FIG. 7


200
202
John Homeowner
1440 Monroe Ave
Rochester NY, 14618
123-456-7890
homeowner@gaf.com
Congratulations!
You have received a Pictometry Roof Squares Report compliments of GAF. This report provides an estimate of the number of squares on your roof.
204
REPORT DETAILS : INTRODUCTION
HOMEOWNER
John Homeowner
1440 Monroe Ave
Rochester NY, 14618
Order # : PIC-000012840
Phone : 123-456-7890
Email : homeowner@gaf.com
GAF
REPORT BY
Pictometry
formerly GeoEstimator
Find out more: GeoEstimator.com
Copyright 2011 - Pictometry International Corp. - All Rights Reserved. Do not scan or otherwise copy. Copying is illegal.
For example, do not make or distribute copies for collecting bids or estimates.
Page: 1
202

FIG. 8

200

GAF

204



206

Your roof is estimated at **20.2 squares***+/- 10%

208

A copy of your report is being sent to the following GAF Master Elite Contractors who will be able to provide a quotation for installation services.

| Contractor 1 | Contractor 2 |
|---|---|
| 123 Main Street | 456 Main Street |
| Anywhere, MY 11735 | Anywhere, MY 107470 |
| 800Contractor1 | 800Contractor2 |

*DISCLAIMER: The information contained in this report is for estimating purposes, and should be verified by a roofing professional. Use of this report is subject to terms and conditions found at www.pictometry.com/roof.

**REPORT DETAILS : INTRODUCTION**

HOMEOWNER

| | |
|---|---|
| John Homeowner | Order # : PIC-000012840 |
| 1440 Monroe Ave | Phone : 123-456-7890 |
| Rochester NY, 14618 | Email : homeowner@gaf.com |

GAF® — REPORT BY — Pictometry formerly GeoEstimator®

Find out more: GeoEstimator.com

Copyright 2011 - Pictometry International corp. - All Rights Reserved. Do not scan or otherwise copy. Copying is illegal. For example, do not make or distribute copies for collecting bids or estimates.

Page: 2

**FIG. 8 (Continued)**

# METHOD AND SYSTEM FOR QUICK SQUARE ROOF REPORTING

## CROSS-REFERENCE TO RELATED APPLICATIONS

Not Applicable.

## BACKGROUND

Residential and/or commercial property owners approaching a major roofing project may be unsure of the amount of material needed and/or the next step in completing the project. Generally, such owners contact one or more contractors for a site visit. Each contractor must physically be present at the site of the structure in order to make a determination on material needs and/or time. The time and energy for providing such an estimate becomes laborious and may be affected by contractor timing, weather, contractor education, and the like. Estimates may be varied even between contractors in determination of estimated square footage causing variance in supply ordering as well. Additionally, measuring an actual roof may be costly and potentially hazardous—especially with steeply pitched roofs. Completion of a proposed roofing project may depend on ease in obtaining a simplified roofing estimate and/or obtaining reputable contractors for the roofing project.

Images are currently being used to measure objects and structures within the images, as well as to be able to determine geographic locations of points within the image when preparing estimates for a variety of construction projects, such as roadwork, concrete work, and roofing. Estimating construction projects using software may increase speed at which an estimate can be prepared, and may reduce labor and fuel costs associated with on-site visits.

## BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

Like reference numerals in the figures represent and refer to the same or similar element or function. Implementations of the disclosure may be better understood when consideration is given to the following detailed description thereof. Such description makes reference to the annexed pictorial illustrations, schematics, graphs, drawings, and appendices. In the drawings:

FIG. **1** is a schematic diagram of an embodiment of a roof estimator reporting system according to the instant disclosure.

FIG. **2** is a block diagram of an embodiment of one or more memory according to the instant disclosure.

FIG. **3** is an exemplary embodiment of a program logic according to the instant disclosure.

FIG. **4** is another exemplary embodiment of a program logic according to the instant disclosure.

FIG. **5** is yet another exemplary embodiment of a program logic according to the instant disclosure.

FIG. **6** is a further exemplary embodiment of a program logic according to the instant disclosure.

FIG. **7** is an exemplary slope factor chart for determining pitch factors according to the instant disclosure.

FIG. **8** is an exemplary embodiment of a roofing report presentation page according to the instant disclosure.

## DETAILED DESCRIPTION OF INVENTIVE CONCEPT

Before explaining at least one embodiment of the inventive concept disclosed herein in detail, it is to be understood that



the inventive concept is not limited in its application to the details of construction and the arrangement of the components or steps or methodologies set forth in the following description or illustrated in the drawings. The inventive concept disclosed herein is capable of other embodiments or of being practiced or carried out in various ways. Also, it is to be understood that the phraseology and terminology employed herein is for the purpose of description and should not be regarded as limiting in any way.

In the following detailed description of embodiments of the inventive concept, numerous specific details are set forth in order to provide a more thorough understanding of the inventive concept. It will be apparent to one of ordinary skill in the art, however, that the inventive concept within the disclosure may be practiced without these specific details. In other instances, well-known features have not been described in detail to avoid unnecessarily complicating the instant disclosure.

Referring now to the drawings, and in particular to FIG. **1**, shown therein and designated by a reference numeral **100** is an exemplary computer system **100** constructed in accordance with the present disclosure. The system **100** can be a system or systems that are able to embody and/or execute the logic of the processes described herein. The logic embodied in the form of software instructions, or firmware may be executed on any appropriate hardware which may be a dedicated system or systems.

As used herein, the terms "network-based", "cloud-based" and any variations thereof, are intended to include the provision of configurable computational resources on demand via interfacing with a computer and/or computer network, with software and/or data at least partially located on the computer and/or computer network, by pooling processing power of two or more networked processors.

As used herein, the terms "comprises", "comprising", "includes", "including", "has", "having", or any other variation thereof, are intended to be non-exclusive inclusions. For example, a process, method, article, or apparatus that comprises a set of elements is not limited to only those elements but may include other elements not expressly listed or even inherent to such process, method, article, or apparatus.

As used in the instant disclosure, the terms "provide", "providing", and variations thereof comprise displaying or providing for display a webpage (e.g., roofing webpage) to one or more user terminals interfacing with a computer and/or computer network(s) and/or allowing the one or more user terminal(s) to participate, such as by interacting with one or more mechanisms on a webpage (e.g., roofing webpage) by sending and/or receiving signals (e.g., digital, optical, and/or the like) via a computer network interface (e.g., Ethernet port, TCP/IP port, optical port, cable modem, and combinations thereof). A user may be provided with a web page in a web browser, or in a software application, for example.

As used herein, the term "roof request", "roofing request", "roofing order", and any variations thereof may comprise a feature of the graphical user interface or a feature of a software application, allowing a user to indicate to a host system that the user wishes to place an order, such as by interfacing with the host system over a computer network and exchanging signals (e.g., digital, optical, and/or the like), with the host system using a network protocol, for example. Such mechanism may be implemented with computer executable code executed by one or more processors, for example, with a button, a hyperlink, an icon, a clickable symbol, and/or combinations thereof, that may be activated by a user terminal interfacing with the at least one processor over a computer network, for example.

Further, unless expressly stated to the contrary, "or" refers to an inclusive or and not to an exclusive or. For example, a condition A or B is satisfied by anyone of the following: A is true (or present) and B is false (or not present), A is false (or not present) and B is true (or present), and both A and B are true (or present).

In addition, the use of the "a" or "an" are employed to describe elements and components of the embodiments herein. This is done merely for convenience and to give a general sense of the inventive concept. This description should be read to include one or more, and the singular also includes the plural unless it is obvious that it is meant otherwise.

Finally, as used herein any reference to "one embodiment" or "an embodiment" means that a particular element, feature, structure, or characteristic described in connection with the embodiment is included in at least one embodiment. The appearance of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment.

Referring now to FIG. **1**, shown therein is an exemplary embodiment of a roof estimator reporting system **100** according to the instant disclosure. The system **100** comprises two or more host systems **102** and **126** interfacing and/or communicating with one or more user terminals **104** via a network **106**.

The one or more user terminals **104** may be implemented as a personal computer, a smart phone, network-capable TV set, TV set-top box, a tablet, an e-book reader, a laptop computer, a desktop computer, a network-capable handheld device, a video game console, a server, a digital video recorder, a DVD-player, a Blu-Ray player and combinations thereof, for example. In an exemplary embodiment, the user terminal **104** may comprise an input device **122**, an output device **124**, a processor (not shown) capable of interfacing with the network **106**, processor executable code (not shown), and a web browser capable of accessing a website and/or communicating information and/or data over a network, such as the network **106**. As will be understood by persons of ordinary skill in the art, the one or more user terminals **104** may comprise one or more non-transient memories comprising processor executable code and/or software applications, for example.

The input device **122** may be capable of receiving information input from a user and/or other processor(s), and transmitting such information to the user terminal **104** and/or to the host system **102**. The input device **122** may be implemented as a keyboard, a touchscreen, a mouse, a trackball, a microphone, a fingerprint reader, an infrared port, a slide-out keyboard, a flip-out keyboard, a cell phone, a PDA, a video game controller, a remote control, a fax machine, a network interface, and combinations thereof, for example.

The output device **124** may output information in a form perceivable by a user and/or other processor(s). For example, the output device **124** may be a server, a computer monitor, a screen, a touchscreen, a speaker, a website, a TV set, a smart phone, a PDA, a cell phone, a fax machine, a printer, a laptop computer, and combinations thereof. It is to be understood that in some exemplary embodiments, the input device **122** and the output device **124** may be implemented as a single device, such as, for example, a touchscreen or a tablet. It is to be further understood that as used herein the term user is not limited to a human being, and may comprise a computer, a server, a website, a processor, a network interface, a human, a user terminal, a virtual computer, and combinations thereof, for example.

The system **100** may include one or more host systems. For example, FIG. **1** illustrates system **100** having two host systems **102** and **126**. The host systems **102** and **126** may be partially or completely network-based or cloud based, and not necessarily located in a single physical location. Each of the host systems **102** and **126** may further be capable of interfacing and/or communicating with the one or more user terminals **104** via the network **106**, such as by exchanging signals (e.g., digital, optical, and/or the like) via one or more ports (e.g., physical or virtual) using a network protocol, for example. Additionally, each host system **102** and **126** may be capable of interfacing and/or communicating with other host systems directly and/or via the network **106**, such as by exchanging signals (e.g., digital, optical, and/or the like) via one or more ports.



In some embodiments, host systems **102** and **126** may be independently controlled by separate entities. Host system **102** may be controlled by a first company and host system **126** may be controlled by a second company distinct from the first company. For example, host system **102** may be controlled by a roofing material supplier and host system **126** may be controlled by a roofing report company. The roofing material supplier may be a separate entity from the roofing report company.

The host system **102** may be referred to hereinafter as the "first host system" and the host system **126** may be referred to hereinafter as the "second host system". The first host system **102** may comprise one or more processors **108** working together, or independently to, execute processor executable code, one or more memories **110** capable of storing processor executable code, one or more input devices **112**, and one or more output devices **114**. Each element of the first host system **102** may be partially or completely network-based or cloud-based, and not necessarily located in a single physical location.

The one or more processors **108** may be implemented as a single or plurality of processors **108** working together, or independently to execute the logic as described herein. Exemplary embodiments of the one or more processors **108** include a digital signal processor (DSP), a central processing unit (CPU), a field programmable gate array (FPGA), a microprocessor, a multi-core processor, and/or combinations thereof. The one or more processors **108** may be capable of communicating with the one or more memories **110** via a path (e.g., data bus). The one or more processors **108** may be capable of communicating with the input devices **112** and the output devices **114**.

The one or more processors **108** may be further capable of interfacing and/or communicating with the one or more user terminals **104** via the network **106**. For example, the one or more processors **108** may be capable of communicating via the network **106** by exchanging signals (e.g., digital, optical, and/or the like) via one or more physical or virtual ports using a network protocol. It is to be understood that in certain embodiments using more than one processor **108**, the one or more processors **108** may be located remotely from one another, located in the same location, or comprising a unitary multi-core processor (not shown). The one or more processors **108** may be capable of reading and/or executing processor executable code and/or of creating, manipulating, altering, and/or storing computer data structures into one or more memories **110**.

The one or more memories **110** may be capable of storing processor executable code. Additionally, the one or more memories **110** may be implemented as a conventional non-transient memory **110**, such as, for example, random access memory (RAM), a CD-ROM, a hard drive, a solid state drive, a flash drive, a memory card, a DVD-ROM, a floppy disk, an optical drive, and/or combinations thereof. It is to be understood that while one or more memories **110** may be located in

the same physical location as the first host system **102**, the one or more memories **110** may be located remotely from the first host system **102**, and may communicate with the one or more processor **108** via the network **106**. Additionally, when more than one memory **110** is used, a first memory **110** may be located in the same physical location as the first host system **102**, and additional memories **110** may be located in a remote physical location from the first host system **102**. The physical location(s) of the one or more memories **110** may be varied. Additionally, one or more memories **110** may be implemented as a "cloud memory" (i.e., one or more memory **110** may be partially or completely based on or accessed using the network **106**).

The one or more input devices **112** may transmit data to the processors **108**, and may be implemented as a keyboard, a mouse, a touchscreen, a camera, a cellular phone, a tablet, a smart phone, a PDA, a microphone, a network adapter, and/or combinations thereof. The input devices **112** may be located in the same physical location as the first host system **102**, or may be remotely located and/or partially or completely network-based.

The one or more output devices **114** may transmit information from the processor **108** to a user, such that the information may be perceived by the user. For example, the output devices **114** may be implemented as a server, a computer monitor, a cell phone, a tablet, a speaker, a website, a PDA, a fax, a printer, a projector, a laptop monitor, and/or combinations thereof. The output device **114** may be physically co-located with the first host system **102**, or may be located remotely from the first host system **102**, and may be partially or completely network based (e.g., website). As used herein, the term "user" is not limited to a human, and may comprise a human, a computer, a host system, a smart phone, a tablet, and/or combinations thereof, for example.

The first host system **102** may directly communicate with the second host system **126** and/or communicate via network **106**. Generally, the first host system **102** may include one or more processors **108** capable of executing a first set of processor executable code and the second host system **126** may include one or more processors **128** capable of executing a second set of processor executable code.

The second host system **126** may further comprise one or more memories **130** capable of storing processor executable code, one or more input devices **132**, and one or more output devices **134**. Each element of the second host system **126** may be partially or completely network-based or cloud based, and not necessarily located in a single physical location.

The one or more processors **128** may be implemented as a single or a plurality of processors **128** working together to execute the logic described herein. Exemplary embodiments of the one or more processors **128** include a digital signal processor (DSP), a central processing unit (CPU), a field programmable gate array (FPGA), a microprocessor, a multi-core processor, and/or combinations thereof. The one or more processors **128** may be capable of communicating with the one or more memories **130** via a path (e.g., data bus). The one or more processors **128** may be capable of communicating with the input devices **132** and the output devices **134**.

The one or more processors **128** may be further capable of interfacing and/or communicating with the one or more user terminals **104** via the network **106**. For example, the one or more processors **128** may be capable of communicating via the network **106** by exchanging signals (e.g., digital, optical, and/or the like) via one or more physical or virtual ports using a network protocol. It is to be understood that in certain embodiments using more than one processor **128**, the one or more processors **128** may be located remotely from one another, located in the same location, or comprising a unitary multi-core processor (not shown). The one or more processors **128** may be capable of reading and/or executing processor executable code and/or of creating, manipulating, altering, and/or storing computer data structures into one or more memories **130**.



The one or more memories **130** may be capable of storing processor executable code. Additionally, the one or more memories **130** may be implemented as a conventional non-transient memory **130**, such as, for example, random access memory (RAM), a CD-ROM, a hard drive, a solid state drive, a flash drive, a memory card, a DVD-ROM, a floppy disk, an optical drive, and/or combinations thereof. It is to be understood that while one or more memories **130** may be located in the same physical location as the second host system **126**, the one or more memories **130** may be located remotely from the second host system **126**, and may communicate with the one or more processor **128** via the network **106**. Additionally, when more than one memory **130** is used, a first memory **130** may be located in the same physical location as the second host system **126**, and additional memories **130** may be located in a remote physical location from the second host system **126**. The physical location(s) of the one or more memories **130** may be varied. Additionally, one or more memories **130** may be implemented as a "cloud memory" (i.e., one or more memory **130** may be partially or completely based on or accessed using the network **106**).

The input devices **132** may transmit data to the processors **128**, and may be implemented as a keyboard, a mouse, a touchscreen, a camera, a cellular phone, a tablet, a smart phone, a PDA, a microphone, a network adapter, and/or combinations thereof. The input devices **132** may be located in the same physical location as the second host system **126**, or may be remotely located and/or partially or completely network-based.

The output devices **134** may transmit information from the processors **128** to a user, such that the information may be perceived by the user. For example, the output devices **134** may be implemented as a server, a computer monitor, a cell phone, a tablet, a speaker, a website, a PDA, a fax, a printer, a projector, a laptop monitor, and/or combinations thereof. The output devices **134** may be physically co-located with the second host system **126**, or may be located remotely from the second host system **126**, and may be partially or completely network based (e.g., website).

The network **106** may permit bi-directional communication of information and/or data between the first host system **102**, the second host system **126** and/or user terminals **104**. The network **106** may interface with the first host system **102**, the second host system **126**, and the user terminals **104** in a variety of ways. For example, the network **106** may interface by optical and/or electronic interfaces, and/or may use a plurality of network topographies and/or protocols including, but not limited to, Ethernet, TCP/IP, circuit switched paths, and/or combinations thereof. For example, the network **106** may be implemented as the World Wide Web (or Internet), a local area network (LAN), a wide area network (WAN), a metropolitan network, a wireless network, a cellular network, a GSM-network, a CDMA network, a 3G network, a 4G network, a satellite network, a radio network, an optical network, a cable network, a public switched telephone network, an Ethernet network, and/or combinations thereof. Additionally, the network **106** may use a variety of network protocols to permit bi-directional interface and/or communication of data and/or information between the first host system **102**, the second host system **126**, and/or one or more user terminals **104**.

Referring to FIGS. **1** and **2**, the one or more memories **110** may store processor executable code and/or information comprising a user database **136**, a contractor database **137**, a first image database **138** and program logic **139**. The processor executable code may be stored as a data structure, such as a database and/or a data table, for example.

The user database **136** may include information about customers engaging with the first host system **102**. For example, one or more customers may access the first host system **102** through the one or more user terminals **104**. The first host system **102** may provide a roof request website to the user terminal **104**. The roof request website may be directed by the one or more processors **108**. The processor **108** may also direct the one or more customers to a login/registration portion of the website.

In some embodiments, customers may register a user profile with the first host system **102**. The user profile may be created and/or stored in the user database **136** by the processor **108**. For example, the customer may be prompted by the processor **108** to provide login credentials (e.g., username and/or password). Login credentials may allow the processor **108** to authenticate the customer against the user database **136**. In this manner, the first host system **102** may access the user profile in the user database **136**. The user profile may include information including, but not limited to, demographic information including, but not limited to, name, age, address, billing account information, username, password, behavioral information, experience, gender, and/or the like.

If user authentication is successful, the user profile may be accessed by the processor **108**. If the user authentication fails, the customer may be returned to the login/registration page, where the customer may be prompted for a username and password again. Optionally, the processor **108** may block a customer from entering a username and/or password after a preset number of failed authentication attempts.

In some embodiments, customers may be prompted by the processor **108** to provide information for a user profile without registration and/or authentication using a username and/or password. The user profile may be created and/or stored in the user database **136** by the processor **108**. For example, the processor **108** may prompt the customer to provide demographic information (e.g., name, address, billing account information, and the like), and store the information in a user profile for the customer using a unique customer identification.

The contractor database **137** may comprise information about roofing contractors within a given geographic location. Each roofing contractor may be associated with a contractor profile having information including, but not limited to, roofing contractor business name, roofing contractor owner name, address, experience level, age of contractor business, review information, and the like. In some embodiments, the contractor profile may include a geographical category assignment identification (ID). For example, the contractor profile may be assigned a numerical or alphabetical identification based on geographic location of the business.

In some embodiments, the contractor profile may include review information. The review information may include positive and/or negative feedback relating to each contractor. For example, the review information may be based on prior customer feedback of customers using the system **100**. Review information may also be obtained from one or more outside databases (e.g., Yelp, Google review, and/or the like).

One or more contractors may provide a contractor profile via the first host system **102**. For example, one or more contractors may access the roof review website of the first host system **102** via the user terminal **104**. The processor **108** may direct the contractor via the roof review website to a login/registration portion of the website. If the contractor has previously registered with the first host system **102**, the contractor may be prompted by the processor **108** to provide login credentials (e.g., username and/or password), which may allow the processor **108** to authenticate the contractor against the contractor database **137**.

If the contractor is not registered with the first host system **102**, the first host system **102** may prompt the contractor to provide information via the one or more user terminals **104** to create a contractor profile. Alternatively, the contractor profiles may be provided in the contractor database **137** without information provided by each contractor. For example, a user of the first host system **102** may provide information via the input device **112**, the network **106**, and/or the like, setting up a contractor profile without direct knowledge of the contractor.

The one or more memories **110** may include the image database **138**. The image database **138** may store geo-referenced imagery. Such imagery may be represented by a single pixel map, and/or by a series of tiled pixel maps that when aggregated recreate the image pixel map. Imagery may include nadir, ortho-rectified and/or oblique geo-referenced images. The one or more processors **108** may provide the images via the image database **138** to customers at the one or more user terminals **104**. Customers, using the user terminals **104**, may provide geographic location information associated with a roof request using the geo-referenced images provided by the one or more processors **108**. For example, a customer may be provided a geo-referenced image to validate the location of a structure (e.g., roof). In some embodiments, the customer may be able to select the structure (e.g., via a drag-and-drop user interface) to pinpoint a location of the structure within the image. Selection of the structure may provide location information (e.g., latitude/longitude coordinate, or and the like) of the structure to the first host system **102**. For simplicity, the description will provide for a roof as the structure of interest. However, is should be apparent that other structures of buildings and/or landscapes may be used in accordance with the present disclosure.

The one or more memories **110** may further store processor executable code and/or instructions, which may comprise the program logic **139**. The program logic **139** may comprise processor executable instructions and/or code, which when executed by the processor **108**, may cause the processor **108** to generate, maintain, provide, and/or host a website providing one or more roofing requests, for example. The program logic **139** may further cause the processor **108** to collect user information and/or contractor information, create user profiles and/or contractor profiles, provide users one or more geo-referenced images, and allow one or more users to validate a location of the roof as described herein.

The one or more processors **108** may generate, maintain, or provide one or more roofing orders to the second host system **126**. For example, the one or more processors **108** may provide the one or more roofing orders to the second host system **126** by copying information obtained and/or stored in one or more memories **110**. The roofing orders may include contractor profile, user profile, user validated images, a unique ordering ID, and/or the like.

The one or more memories **130** of the second host system **126** may store processor executable code and/or information comprising an order database **140**, a second image database **141** and the program logic **142**. The processor executable code may be stored as a data structure, such as a database and/or a data table, for example.

The order database **140** may include information about a roofing order placed by a customer and copied by the first host system **102**. For example, a roofing order may include contractor profile, user profile, user validated images, a unique ordering ID, and/or the like. The second host system **126** may access the order database **140** to provide a roofing report as described in detail herein.

The one or more memories **130** of the second host system **126** may also include a second image database **141**. The second image database **141** may provide additional nadir, ortho-rectified, and/or oblique geo-referenced and/or non-geo-referenced images for use in providing a roofing report as described in detail herein. Alternatively, the image database **138** and the image database **141** may be the same database.

The one or more memories **130** of the second host system **126** may further store processor executable code and/or instructions, which may comprise program logic **142**. The program logic **142** may comprise processor executable instructions and/or code, which when executed by the one or more processors **128**, may cause the one or more processors **128** to generate, maintain, and/or provide a website or series of websites for providing roofing reports. The program logic **142** may further cause the one or more processors **128** to allow one or more users to participate in executing a roofing report via the input devices **132**.

Referring to FIG. **3**, shown therein is an exemplary flow chart **144** of program logic **139** for creating a roof report order which may be used with the first host system **102** according to the instant disclosure. Program logic **139** may comprise executable code, which when executed by the one or more processors **108** may cause the one or more processors **108** to execute one or more of the following:

The program logic **139** may provide for one or more user terminals **104** interfacing with the processor **108** over the network **106** to provide one or more roofing request website pages allowing customers to place a roofing request order. Each order is generally a request of the customer to provide estimated square footage of a specific roof. Additionally, each order may also include a request for contractor information and/or a bid request for estimate costs and associated features of materials, supplies, physical labor, and the like.

Generally, in a step **145**, customers using one or more user terminals **104** may provide user information to the first host system **102**. The user information may then be used to prepare one or more user profiles for use in preparing the roofing report. Additionally, program logic **139** may generate a unique identification number and/or alpha numeric character to associate with the user profile.

The user information may include a location of the roof provided by the customer. For example, the customer may provide a residential and/or commercial address of the roof. One or more processors **108** may direct customers to validate the location of the roof using user terminals **104**, in step **146**. For example, processors **108** may provide one or more images via the image database **138**. The images may be geo-referenced images illustrating portions or all of the roof. The program logic **139** may cause the processor **108** to provide users the one or more geo-referenced images, and allow the customer to validate the location of the roof. For example, the customer may be able to use a drag-and-drop element provided by the program logic **139** via user terminal **104** to select the roof within the one or more geo-referenced images. Selection of the roof within the one or more geo-referenced images may provide one or more validated images and a validated location of the roof. In some embodiments, the geographic location may include coordinates, and validation of the geographic location may be provided by a customer by altering one or more coordinates of the geographic location. Customers may alter the one or more coordinates by methods including, but not limited to, manual manipulation, drag-and-drop elements, and the like.

It should be understood that validation of the geo-referenced images may be provided by the second host system **126** via the one or more processors **128** in lieu of, or in combination with host system **102**. For example, the first host system **102** may direct customers to the second host system **126** wherein the one or more processors **128** of the second host system **126** provide geo-referenced images from image database **141** to the customer for validation of one or more roof and/or roofing structures. As such, in some embodiments, only the second host system **126** provides geo-referenced images in the image database **141**.

The first host system **102** may determine contractor availability within a region of interest about the validated location of the roof as shown in step **147**. For example, program logic **139** may extract the validated location and compare the validated location against location of contractors in a region of interest. The region of interest may be determined by the customer via user terminal and/or the region of interest may be a pre-programmed determination. For example, the region of interest may be a five mile radius about the validated location. Contractor availability may include contractors having a contractor profile within the contractor database **137**. Contractors within the contractor database **137** may be provided with a copy of the roofing report as described herein.

The program logic **139** may direct the one or more processors **108** to create and/or store a roofing order for the customer as shown in step **148**. Additionally, the program logic **139** may direct one or more processors to transfer the roofing order to the second host system **126**.

FIG. **4** illustrates a flow chart **149** of an exemplary embodiment of the program logic **139** and/or **142** for processing a roof report order which may be used with the system **100** according to the instant disclosure. The program logic **139** comprises processor executable code, that when executed by the processor **108**, may cause the processor **108** to execute one or more of the following:

The program logic **139** may include a step **150** wherein one or more user terminals **104** interfacing with the processor **108** over the network **106** may be provided with one or more websites having a mechanism allowing a customer to request a roof report. The customer may provide the request to the first host system **102** using the one or more websites, in a step **152**. Prior to providing customer information, the customer may be notified that the first host system **102** may distribute any contact information provided by the customer to contractors provided within the first host system **102**. The one or more processors **108** may provide the customer an option for agreeing to terms of service (e.g., distribution of their contact information), in a step **154**.

In a step **156**, the roof report request website may include queries regarding customer information including, but not limited to, customer name, address, address of the roof, billing information, and the like. The customer information may be provided by the one or more processors **108** and stored in the one or more memories **110**. For example, the customer information may be provided by processors **108** as a user profile and stored in the user database **136** of the one or more memories **110**.

Customers may be able to select the desired roof, location, and/or the like on the one or more websites provided by the processor **108** over the network **106**, in step **158**. For example, the customer may use the one or more user terminals **104** to provide a geographical location (e.g., address, latitude/longi-

tude coordinates, or the like), a geo-referenced image, and/or an element within a geo-referenced image. Once the geographical location of the roof is selected, the processor **108** may provide a verification web page or similar mechanism for customer review and/or approval of a proposed order, in a step **160**. The first host system **102** may receive the proposed order via the processor **108**, store the order and/or transfer the order to the second host system **126** for processing, in a step **162**. The processor **108** may provide a confirmation webpage or similar mechanism informing the customer of a successful order placement, in a step **164**.

FIG. **5** illustrates a flow chart **169** of an exemplary embodiment of the program logic **139** and/or **142** for providing a roof report which may be used with the system **100** according to the instant disclosure. Generally, processing of the proposed order may be provided using the second host system **126**. The program logic **142** comprises processor executable code, that when executed by the processor **128**, may cause the processor **128** to execute one or more of the following:

The second host system **126** may receive the proposed order via the one or more processors **108** of the first host system **102**. Generally, the validity of the location of the roof provided by the customer may be determined, in a step **170**. In a step **172**, the second host system **126** may determine if the location of the roof provided by the customer exists. If the location is not found, the customer may be further contacted by the second host system **126** and/or the first host system **102** requesting resubmission or additional information for the proposed order, in a step **174**. Additionally, in a step **176**, the second host system **126** may determine if corresponding imagery within image database **141** exists for the location provided by the customer. If there is no corresponding imagery, the customer may be further contacted by the second host system **126** and/or the first host system **102** with a status message indicating no suitable imagery of the roof currently exists, in a step **178**.

The second host system **126** may further process and review the order, in a step **180**. An exemplary series of steps for implementing step **180** is shown in a flow chart **188** illustrated in FIG. **6**. For example, the one or more processors **128** of the second host system **126** may receive the proposed order, in a step **190**. The one or more processors **128** may extract order related information and images. Generally, a user may access a roof report website provided by the one or more processors **128** to review and/or process the proposed order. For example, the user may access the roof report website using the input devices **132** and the output devices **134** to review and/or process the proposed order.

In some embodiments, using the input devices **132** and/or the output devices **134**, the user may provide additional details to the proposed order regarding the roof including, but not limited to, identification of areas of the roof (e.g., eaves, drip edges, ridges, and the like), pitch, distance, angle, and/or the like.

The footprint of the roof may be determined, in step **192**. For example, the footprint of the roof may be determined using systems and methods including, but not limited to, those described in U.S. Patent Publication No. 2010/0179787, U.S. Patent Publication No. 2010/0110074, U.S. Patent Publication No. 2010/0114537, U.S. Patent Publication No. 2011/0187713, U.S. Pat. No. 8,078,436, and U.S. Ser. No. 12/909,692, all of which are incorporated by reference herein in their entirety

In some embodiments, the one or more processors **128** may provide one or more websites to the user for evaluation of multiple oblique images to provide the footprint of the roof. For example, the user and/or the processors **128** may identify edges of the roof. Two-dimensional and/or three-dimensional information regarding the edges (e.g., position, orientation, and/or length) may be obtained from the images. Using the two-dimensional and/or three-dimensional information (e.g., position orientation, and/or length), line segments may be determined with multiple line segments forming at least a portion of the footprint of the roof.

The footprint may provide a two-dimensional boundary and/or outline of the roof. In a step **194**, a predominant pitch value for the roof may be determined. In some embodiments, a predominant pitch value may be determined using the footprint as a boundary of the roof. The predominant pitch may be a weighted average of individual pitch factors for two or more portions of the roof. FIG. **7** illustrates an exemplary slope factor chart for determining pitch factors. For example, a first portion of the roof (e.g., 60% of the roof) may be at a 6:12 pitch. The 6:12 pitch corresponds to 1.1180 as the pitch factor). A second portion of the roof (e.g. 40% of the roof) may be at a 4:12 pitch. The 4:12 pitch corresponds to 1.0541 as the pitch factor. Thus, the weighted value of the first portion of the roof having 6:12 pitch is:

(Pitch Factor)*(Percentage of roof)=First Weighted Value

1.1180*0.6=0.6708 EQ. 1

The weighted value of the second portion of the roof having 4:12 pitch is:

(Pitch Factor)*(Percentage of roof)=Second Weighted Value

1.0541*0.4=0.42164 EQ. 2

The sum of 0.6708 and 0.42164 is 1.09244 as the total weighted pitch value. A total weighted pitch value of 1.09244 is closest to a pitch factor of 1.0833 in the table in FIG. **7**. This pitch factor corresponds to a 5:12 pitch. As such, the predominant pitch in this scenario would be 5:12. Using the predominant pitch and outer dimensions provided by the footprint, an estimated area of the roof may be determined, in a step **196**.

In some embodiments, the user may review and reevaluate the estimated area of the roof obtained. For example, using the system and methods described herein, the user may review the steps for obtaining the footprint, the predominant pitch value, and/or estimated area. Additionally, the user may provide for a review report. The review report may comprise feedback to the one or more processors **128** regarding errors, concerns, and/or the like.

Referring to FIGS. **1**, **6** and **8**, in a step **184** and **186**, a customer and/or contractor may receive a roof report **200**. FIG. **8** illustrates an exemplary embodiment of a roof report **200** provided in accordance with the present disclosure. The program logic **139** may provide for one or more user terminals **104** interfacing with the processor **108** over the network **106** to provide one or more roofing report website pages allowing customers and/or contractors to view the roof report **200**.

Generally, roofing reports within the industry are detailed with data sets regarding pitch, total area, eave length, hip ridge length, valley length, number of box vents, and the like. The roof report **200** may be streamlined to generally include data sets such as customer information **202**, roofing **204**, estimated area detail **206**, and contractor(s) **208**. The customer information data set **202** may include the customer name, customer contact information, and the like. The roofing data set **204** may include one or more nadir images of the roof and one or more oblique images of the roof. The estimated area detail **206** may provide the total estimated roof area as

determined using the second host system **126** described herein. The contractor data set **208** may include one or more contractor names and associated contractor contact information for the one or more contractor names.

The roof report **200** may be distributed using the first host system **102** and/or the second host system **126** to the one or more user terminals **104**. For example, the roof report **200** may be distributed using the first host system **102** to a contractor at a first user terminal **104** and the roof report **200** may be distributed using the first host system **102** to the customer at a second user terminal **104**.

In some embodiments, the first host system **102** and/or the second host system **126** may distribute the roof report **200** to one or more recipients in addition to, or in lieu of, the customer. For example, the roof report **200** may be distributed to recipients including, but not limited to, roof material suppliers (e.g., small roofing companies, Lowes, Home Depot, and the like), insurance companies, real estate agencies, home services and/or cleaning companies, insulation companies, auditing companies, and/or contractors. Contractors and/or suppliers may be associated with residential and/or commercial building elements and/or services including, but not limited to, fireplaces, pool sales, fencing, lawn maintenance, gardening, pavement resurfacing, decking, sunrooms, roofing, guttering, custom Christmas light designs, siding, windows, doors, garage doors, and the like.

In some embodiments, additional data sets may be included within the roof report **200**. For example, data sets may include, but are not limited to, weather data, insurance/valuation data, census data, school district data, real estate data, and the like.

Weather data sets may be provided by one or more databases storing information associated with weather (e.g., inclement weather). A weather data set within the roof report **200** may include, but is not limited to, hail history information and/or location, wind data, severe thunderstorm data, hurricane data, tornado data, and/or the like. In some embodiments, the one or more databases providing weather information may be hosted by a separate system (e.g., LiveHailMap.com) and provide information to the first host system **102** and/or the second host system **126**. The weather data set may be included within the roof report **200** and provided to the customer and/or other parties. In some embodiments, weather data sets may be provided within a report as described herein without the addition of roof related information (e.g., roofing data set **204**).

Insurance and/or valuation data sets may be provided by one or more databases storing information associated with housing insurance and/or valuation. An insurance and/or valuation data set may include, but is not limited to, insured value of the home, insurance premium amount, type of residence (e.g., multi-family, single family), number of floors (e.g., multi-floor, single-floor), building type, and/or the like. In some embodiments, the one or more databases may be hosted by a separate system (e.g., Bluebook, MSB, 360Value) and provide information to the first host system **102** and/or the second host system **126**.

The insurance and/or valuation data set may be included within the roof report **200** and provided to the customer and/or other parties. For example, during underwriting of a home, an insurance company may be able to request the roof report **200** on a home that is recently purchased. The information within the roof report **200** may be integrated with insurance information provided by an insurance database and used to form a quote report. The quote report may be sent to the customer and/or insurance company. Alternatively, the roof report **200** may be solely sent to the insurance company with the insurance company using the information to formulate a quote.

In another example, the roof report **200** may be used in an insurance claim. In the case of a catastrophe of a customer, one or more databases may be used to provide an insurance dataset with claim information in the roof report **200**. For example, an insurance database having a policy in force (PIF) and a weather database may be used to correlate information regarding an insurance claim for a particular roof. This information may be provided within the roof report **200**.

Real estate and/or census data sets may also be including within the roof report. The real estate and/or census data sets may be provided by one or more databases having detailed information of a home. For example, a real estate data set may include, but is not limited to, the homeowner's name, the purchase price of the home, number of times the home has been on the market, the number of days the home has been on the market, the lot size, and/or the like. The census data set may include information concerning the number of residents within the home. In some embodiments, the one or more databases may be hosted by a separate system (e.g., Core Logic) and provide information to the first host system **102** and/or the second host system **126** to provide data sets as described herein. The real estate data set may be included within the roof report **200** and provided to the customer and/or other parties.

The roof reports **200** may include roofing data as described herein; however, system **100** may be used to provide other information to a customer and/or other party without roof related information (e.g., roofing data set **204**). For example, in a real estate transaction, one or more databases in host system **102** and/or host system **126** may include recent home sales over time in one or more geographic areas. The footprint of each home and home valuation may be provided in one or more databases within host system **102** and/or host system **126**. Using the systems and methods described herein, a customer (e.g., homeowner) may request a report determining approximate sales price of a home using the footprint and/or valuation versus comparables within the geographic area. The report may provide an approximate sale price of the home. In some embodiments, demographics of the homeowners may be used and stored in one or more databases. The demographic information may be used for potential advertising and/or comparables within the geographic area. In another example, using systems and methods as described herein, a report may be provided for housecleaning and/or home services area (e.g., fireplace cleaning, pool sales, fencing, lawn maintenance/gardening, pavement resurfacing, decking, sunrooms, roofing, guttering, custom Christmas light designs, siding, windows, doors, garage doors, and the like). For example, using a footprint of a home, number of stories within a home, and the like, a determination of average square footage within a home may be determined. This information may be used to formulate a price quote for cleaning services.

Other services related to roofing may be provided within the roof report **200**. For example, using the square footage of the roofing footprint, a price quote may be generated on the cost of insulation for the roof (e.g., energy efficiency, insulation replacement, and the like). Additionally, audits may be performed using information within one or more databases. For example, using the roofing area of a home, historically paid insurance claims for comparables, and validation of payment for a specific claim for the home, a comparison may be made to determine whether the service payment for the

specific claim was within a certain threshold. Auditing, it should be understood, may be applied to other areas as described herein as well.

Although the terms "home" and "house" are used herein, it should be noted that the systems and methods in the present disclosure may be applied to any residential and/or commercial building or structure.

From the above description, it is clear that the inventive concept(s) disclosed herein is well adapted to carry out the objects and to attain the advantages mentioned herein as well as those inherent in the inventive concept(s) disclosed herein. While presently preferred embodiments of the inventive concept(s) disclosed herein have been described for purposed of this disclosure, it will be understood that numerous changes may be made which will readily suggest themselves to those skilled in the art and which are accomplished within the scope and spirit of the inventive concept(s) disclosed herein and defined by the appended claims.

What is claimed is:

**1**. One or more non-transitory computer readable medium storing a set of computer executable instructions for running on one or more computer systems that when executed cause the one or more computer systems to: identify a geographic location of a roof; determine a footprint and predominant pitch of the roof by analyzing one or more image showing the roof; determine an estimated roofing area of the roof based on the predominant pitch and the footprint of the roof; and generate a roof report for determination of an amount of materials needed for a construction project, wherein the roof report includes at least one image showing the roof and the estimated roofing area of the roof.

**2**. The one or more non-transitory computer readable medium storing a set of computer executable instructions for running on one or more computer systems of claim **1**, that when executed further cause the one or more computer systems to determine contact information of one or more contractors within a region of interest of the geographic location of the roof, and to provide a roof report, wherein the roof report includes one or more ortho images of the roof, one or more oblique images of the roof, the estimated roofing area and the contact information of one or more contractor within the region of interest of the geographic location of the roof.

**3**. The one or more non-transitory computer readable medium of claim **2**, wherein the roof report includes contact information of the customer.

**4**. The one or more non-transitory computer readable medium of claim **1**, wherein the one or more non-transitory computer readable medium comprises a first non-transitory computer readable medium of a first host system and a second non-transitory computer readable medium of a second host system.

**5**. The one or more non-transitory computer readable medium of claim **1**, wherein identifying the geographic location of the roof further comprises obtaining contact information of a customer.

**6**. The one or more non-transitory computer readable medium storing a set of computer executable instructions for running on one or more computer systems of claim **1**, that when executed further cause the one or more computer systems to receive customer input to validate geographic location of the roof.

**7**. The one or more non-transitory computer readable medium of claim **6**, wherein the geographic location includes coordinates and validation of the geographic location includes instructions for receiving customer input to alter one or more coordinates of the geographic location.

**8**. The one or more non-transitory computer readable medium of claim **1**, wherein identifying a geographic location of the roof includes identifying one or more edges of the roof in an image.

**9**. The one or more non-transitory computer readable medium storing a set of computer executable instructions for running on one or more computer systems of claim **1**, that when executed further cause the one or more computer systems to identify edges of the roof; determine three-dimensional information of the edges including position, orientation and length using multiple oblique images from multiple cardinal directions; and, determine, automatically, one or more line segments forming a portion of a footprint of the roof utilizing position and orientation of the edges.

**10**. The one or more non-transitory computer readable medium of claim **1**, wherein determining the predominant pitch includes determining a plurality of pitch values with each pitch value associated with a portion of the roof, the predominant pitch based on the plurality of pitch values.

**11**. The one or more non-transitory computer readable medium of claim **10**, wherein each pitch value is associated with an estimated percentage of roof area to provide an average pitch value.

**12**. The one or more non-transitory computer readable medium storing a set of computer executable instructions for running on one or more computer systems of claim **1**, that when executed further cause the one or more computer systems to provide the roof report to one or more contractors, the contractor located within the region of interest of the geographic location of the roof.

**13**. A system, comprising:

two or more host systems, each host system having one or more non-transitory computer readable medium;

the non-transitory computer readable medium of the first host system storing a set of computer executable instructions that when executed by one or more processors causes the one or more processors to:

identify a geographic location of a roof;

determine contact information of at least one contractor within a region of interest about the geographic location of the roof;

the non-transitory computer readable medium of the second host system storing a set of computer executable instructions that when executed by one or more processors causes the one or more processors to:

determine a footprint and predominant pitch of the roof by analyzing one or more image showing the roof;

determine an estimated roofing area based on the predominant pitch and the footprint of the roof; and,

generate a roof report for determination of an amount of materials needed for a construction project, wherein the roof report includes one or more ortho images of the roof, one or more oblique images of the roof, the estimated roofing area and contact information of one or more contractors within the region of interest.

**14**. A roofing estimate method, comprising:

receiving, by at least one computer processor from a user via a user terminal, a geographic location of a roof;

providing to the user, with the computer processor, imagery of the roof based on the geographic location of the roof;

determining and providing, with the computer processor, an estimated roofing area based at least on a predominant pitch and a footprint of the roof by analyzing one or more image showing the roof, the footprint of the roof determined at least in part using at least one image of the roof; and

generating, with the computer processor, a roof report for determination of an amount of materials needed for a construction project, wherein the roof report includes at least one image showing the roof and the estimated roofing area of the roof.

**15**. The roofing estimate method of claim **14**,

wherein the roof report further includes contact information of one or more contractor within a region of interest of the geographic location of the roof.

**16**. The roofing estimate method of claim **14**, wherein the footprint of the roof is determined at least in part with oblique images of the roof.

**17**. The roofing estimate method of claim **14**, wherein the predominant pitch value of the roof based at least in part on the footprint of the roof as a boundary of the roof.

**18**. The roofing estimate method of claim **14**, wherein the predominant pitch is based on a weighted average of individual pitch factors for two or more portions of the roof.

* * * * *